8 N.J. Super. 560 (1950)
73 A.2d 857
KARL M. SMITH, PLAINTIFF,
v.
CHARLES OKERSON, AND OTHERS, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided June 7, 1950.
*563 Mr. Isadore I. Zlotkin, attorney for plaintiff.
Messrs. Parsons, Labrecque, Canzona & Combs (Mr. Theodore D. Parsons), attorneys for defendants.
BIGELOW, J.A.D.
The equitable problems in this case have become moot, and it is now only an action for damages. The plaintiff is a dairy farmer, and the defendants are potato growers, operating the adjoining farm. The first time there was trouble of the kind complained of was in the early fall of 1947, when the defendants sprayed their potato fields with an arsenic solution, in order to kill the vines and so make easier the digging of the potatoes. The spraying apparatus consisted of a tank mounted on a motor truck chassis and, in back, extending out eight or ten feet on each side, a pipe in which were holes or nozzles from which the liquid was ejected in a fine spray or mist. When the sprayer was at the end of the field next to plaintiff's property, some of the arsenic was thrown or drifted across the fence and settled on the vegetation in plaintiff's farm. A few of plaintiff's cattle ate of the vegetation with the poison on it, and died. This was in October, 1947. An action for damages begun in the Common *564 Pleas shortly thereafter was still pending the following summer.
The defendants did not use their spray after October, 1947, until August 18, 1948. That day, Henry Okerson, who is one of the defendants, and the son of his co-defendant, sprayed part of the potato field. Mindful of the happening the preceding year and the pending law suit, he operated the spray with special care but in spite of it a little of the mist bearing the arsenic settled on plaintiff's land and forms the basis of the present action.
The rule was laid down in Fletcher v. Rylands, L.R. 3 H.L. 330, 1 Eng. Rul. Cas. 236 (1868), that one who brings upon his own land anything which would be harmful to his neighbors if it escaped, is liable for the consequences in the event of escape, even though no negligence be proven. But our own courts declined to accept that doctrine. Marshall v. Welwood, 38 N.J.L. 339 (Sup. Ct. 1876). The prevailing American rule admits liability in the absence of negligence, only in connection with an activity that is not a matter of common usage and that necessarily involves a risk of serious harm to others, and not even in such case if the activity is carried on in pursuance of a public duty. Rest. Torts, § 519 et seq. I doubt whether in New Jersey we go even that far.
Our cases reiterate that a man is not in law an insurer that his lawful acts shall not injuriously affect others; that in order to sustain an action, the damage complained of must have come from an act which is wrongful. Ulshowski v. Hill, 61 N.J.L. 375 (Sup. Ct. 1898); DeGray v. Murray, 69 N.J.L. 458 (Sup. Ct. 1903); Beale v. McAlister Coal Co., 82 N.J.L. 151 (Sup. Ct. 1912); Herman v. Handler, 125 N.J.L. 323 (Sup. Ct. 1940). Where liability has been imposed in the absence of negligence, it has been founded on what was considered a nuisance per se. McAndrews v. Collerd, 42 N.J.L. 189 (E. & A. 1879); O'Hara v. Nelson, 71 N.J. Eq. 161, at 167 (Garrison, V.C., 1906). On the other hand, where a landowner was held responsible for polluting the well of his neighbor, the theory of negligence was followed. *565 P. Ballantine & Sons v. Public Service Corp., 86 N.J.L. 331 (E. & A. 1914). Likewise in the case of the Black Tom explosion, New Jersey Fidelity & Plate Glass Ins. Co. v. Lehigh Valley R.R., 92 N.J.L. 467 (E. & A. 1918). Also, where a child drank acid found in a plumber's tool box, Neff v. Daniel, 102 N.J.L. 442 (E. & A. 1926). "In this State, the principles of the law of negligence govern to a large extent the relations of the owners of adjoining land growing out of the contiguity. They ordinarily enter into the determination of the question of reasonable user." Brownsey v. General Printing Ink Co., 118 N.J.L. 505 (Sup. Ct. 1937).
I conclude that the defendants are not answerable to plaintiff unless they were negligent in the spraying of the arsenic solution. Actionable negligence is the failure to use that degree of care that the circumstances of the case call for. Felix v. Adelman, 113 N.J.L. 445 (E. & A. 1934). The likelihood that the act will cause injury to another; the likelihood that the injury will be serious; the utility of the act itself; the feasibility of a substitution whereby the same benefits may be obtained at less hazard,  all these considerations enter into the question of what is reasonable care. At the argument, I stated that it seemed to me that no negligence on the part of the defendants had been proved, but on further reflection, I find to the contrary. The defendants knew from the experience of the preceding October that serious consequences might follow if the mist from their apparatus drifted to plaintiff's land; they were aware that the pressure furnished by their machine  200 to 400 pounds per square inch  would carry the spray perhaps 50 feet. The evidence is convincing that some of the poison did settle on plaintiff's land. I am satisfied that this resulted from the defendants' failure to use due care.
The plaintiff saw young Mr. Okerson spraying his potato vines close to plaintiff's fence and in order to save his cattle from harm, fed them in his barn thereafter until November, instead of allowing them to pasture in his fields. He asks as damages the value of the fodder.
*566 The defendants argue that the measure of damages is the rental value of plaintiff's pasture for the period he was unable to use the land. Belkus v. City of Brockton, 184 N.E. 812 (Mass. 1933). In the absence of special circumstances that would be the correct measure of the loss sustained by one who is wrongfully deprived of the use of his land, but it would not be the correct measure in the present case. See East Jersey Water Co. v. Bigelow, 60 N.J.L. 201 (E. & A. 1897). Generally, a tort-feasor is answerable in damages for the natural and proximate consequences of his act. It is often the duty and always the right of the injured party to take reasonable measures to avert or reduce the damage to his person or property. Prudent, reasonable expenses incurred to that end may be recovered as damages. Den Norske Ameriekalinje Actiesselskabet v. Sun Printing, etc., Assn., 122 N.E. 463 (N.Y. 1919); Wise v. Western Union Tel. Co., 181 A. 302 (Del. 1935). And see Rest. Torts, § 919, and 25 C.J.S., Damages, § 49. The expenses claimed by plaintiff are of that character.
The Smith farm lies on the west side of the Wyckoff Mills Road which runs north and south. Making a rough estimate from the map that was put in evidence, I would say the farm contains about 90 acres. From the highway, Smith's lane runs westerly through the farm. On the north side of the lane, adjacent to the highway, is a lot of about 17 acres, and in the center of it, plaintiff's house and barns. Just beyond this lot, abutting it on the west, and the lane on the north, is defendant's potato farm. On the south side of the lane, opposite the first lot mentioned, is a parcel of 25 acres or so and, west of that, across the lane from defendants' farm, Smith has 45 acres. On the occasion in question, young Okerson drove the sprayer, along the furroughs, south and north, to the lane and back, beginning with that part of his farm nearest plaintiff's 16-acre lot. After the sprayer had passed, some of the vegetation in the lane was found to be wet and some in the 16-acre lot near defendants' fence. Analyses of *567 two samples of the vegetation disclosed arsenic. No other parts of plaintiff's farm received the spray.
The 26-acre lot, south of the lane, was divided by fences into three fields. In August of 1948, one field was in alfalfa, one in alfalfa and grass, and one had been in timothy, but the hay had been mown. After the spraying, plaintiff let his cattle  26 head  into the timothy field for exercise rather than pasturage, since the grass had already been cut. He did not let them into the other two fields for he was unwilling to lose his winter supply of alfalfa. West of these fields, plaintiff on August 18th was using more than half his land, or about 25 acres, for pasture, which his cows reached through the lane. He did not dare let them use the lane after that day and so the cattle were unable to reach this pasture. Very soon, plaintiff plowed up 15 acres of this pasture land. North of the lane, plaintiff had a pasture lot of five or six acres and another field of about the same size where Sudan grass had already been cut. From this pasture lot came one of the samples of grass that contained arsenic.
In fine, plaintiff says that up to August 18th he had plenty of pasturage available,  30 acres in all,  and that defendants' negligence made his pastures unusable and so he had to supply all the feed for his cattle. The parties stipulated that the cost or value of the feed for the three months' period was $2,260. Plaintiff had the fodder on hand,  either grown on his farm or bought earlier,  but he had to replace the food consumed by buying more in the winter or spring of 1949. But this did not affect the cost of the fodder that his cattle consumed after he took them out of the pastures in order to prevent the greater loss that would have followed had his cows cropped the herbage coated with arsenic.
I am entirely persuaded that, after the spraying, plaintiff was wise in taking his herd out of the lane and out of that part of his farm which lies north of the lane and adjoins defendants' property. But I do not understand why he did not remove a section of the fence between the timothy lot and the 15 acres of pasture west of it, so that his cattle could reach *568 and continue to use this pasture. Or other measures might have been adopted, such as scraping the lane. Even so, some emergency feeding was necessary and some miscellaneous expenditure to meet the situation for which defendants were responsible. But a total expense of $2,260 was not warranted by the situation confronting plaintiff.
After weighing all the factors as well as I am able, I assess the damages at $1,000 and will sign a judgment for the plaintiff in that amount with costs.