46 N.J. Super. 74 (1957)
134 A.2d 20
MARGARET BERGQUIST, ADMINISTRATRIX AD PROSEQUENDUM AND GENERAL ADMINISTRATRIX OF THE ESTATE OF PERR ROBERT BERGQUIST, DECEASED, PLAINTIFF-APPELLANT-RESPONDENT,
v.
GEORGE PENTERMAN AND IVAR KIVIMAGE, DEFENDANTS-APPELLANTS, AND POINT PLEASANT HOME CONSTRUCTION COMPANY, ETC., DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued June 10, 1957.
Decided July 25, 1957.
*76 Before Judges GOLDMANN, FREUND and CONFORD.
*77 Mr. Theodore D. Parsons argued the cause for plaintiff-appellant-respondent (Messrs. Parsons, Labrecque, Canzona & Combs, attorneys; Mr. Joseph T. Grause, of counsel).
Mr. Edward E. Kuebler argued the cause for defendants-appellants George Penterman and Ivar Kivimage.
Mr. John M. Pillsbury argued the cause for defendant-respondent Point Pleasant Home Construction Company (Messrs. Roberts, Pillsbury & Carton, attorneys).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Plaintiff, as administratrix ad prosequendum and general administratrix of the estate of Perr Robert Bergquist, brought an action in the Superior Court, Law Division, against George Penterman, a plumbing contractor, his employee Kivimage, and Point Pleasant Home Construction Company (hereinafter "Point Pleasant") for damages for personal injuries to and the death of Bergquist because of their negligence. Decedent was fatally burned as the result of an explosion which occurred on October 13, 1955 while he was doing floor finishing work in a dwelling then under construction at defendant Point Pleasant's development. The matter was heard before a judge and jury. At the close of plaintiff's case Point Pleasant moved for judgment of involuntary dismissal, which was granted. A similar motion, made on behalf of defendants Penterman and Kivimage, was denied. They then proceeded with their witnesses and at the conclusion of the entire case again moved for judgment. The motion was denied and the case submitted to the jury which, after extended deliberation, announced that it was hopelessly deadlocked, whereupon it was dismissed.
This court granted plaintiff's application for leave to appeal from the judgment of involuntary dismissal in favor of Point Pleasant. Similar leave was given defendants Penterman and Kivimage to appeal from the granting of that judgment, as well as from the denial of their own motions for judgments of involuntary dismissal.

*78 I.
At the time of the accident defendant Point Pleasant was engaged in the construction of a development known as Oak Park, located on a large tract it owned in Point Pleasant, N.J. It had completed and sold all the 26 homes comprising the first section of the development, and four in the second. Eight or nine houses were in various stages of completion. The company engaged no general contractor, but furnished the materials for the jobs and, through its secretary-treasurer Potter, arranged for the services of individual contractors at a fixed sum per house. These contractors furnished their own workmen, supplied incidental material, supplies, tools and equipment needed on the jobs, and generally exercised complete supervision over their respective employees and the manner in which the work was done.
Point Pleasant conducted its operations from a field office six blocks from the development. Potter was in charge, with a Mrs. Wood acting in his absence. Schedules containing the job numbers of houses under construction and their tentative completion or delivery dates were posted on a bulletin board for the information of contractors who came to the office. Construction would start as soon as the company had purchase contracts for one or more dwellings. The schedule was a flexible one, the work of each contractor being governed by the progress of the work ahead of him. Generally, contractors worked at their own convenience, since they had jobs other than Point Pleasant's. In order to keep in touch with construction activities, they would ordinarily stop in at the office, or note the progress of other contractors, and begin work when they saw a house was ready for the job they had to do.
Potter testified that he coordinated the activities of all contractors so as to get a house completed at a certain time, if possible. As a completion date approached he would get in touch with contractors and pressure them to complete their jobs. He saw to it that the contractors "did their own *79 work in a workmanlike manner"; once in a while he would go through the houses to see that the work was up to specifications. He claimed to be familiar with the work each contractor had to do, "as a layman." He admitted knowing that a torch had to be used in annealing the copper tubing that went into a heating system such as was installed in the Point Pleasant houses. He also knew that a sealer or lacquer was used in finishing floors, but said he had not inquired as to whether the material was flammable.
According to Potter, house No. 5, where the accident occurred, was handled no differently than any other dwelling in the Oak Park development. It had been sold to one Coulter and his wife, with occupancy promised for October 15, 1955. Coulter was very anxious to move in; as the date came closer he repeatedly requested Potter and those working on the job to do "whatever they could do to get me in my house." He had directed that certain furniture and household appliances he had bought be delivered to the home on October 15.
Potter testified he had told Beaton, the floor finishing contractor, and Penterman, the plumbing contractor, that the house was promised for the 15th. He said that as of October 12 there remained to be done "some painting, paperhanging, floor finishing, some plumbing work * * * outside gutters * * * and the exterior grading." Potter admitted the company was exerting effort to finish the house on time and that he may have talked to Beaton and Penterman on the 12th about finishing the house.
Penterman testified that Point Pleasant supplied the boiler for the heating system but did not deliver it until October 12. He therefore could not do anything about connecting up the heating system before then. He worked on the 12th and had one more day's work to do. He said Potter or Mrs. Wood had told him to finish the plumbing work by October 13; the understanding was that the owners were to move in the next day.
The events of October 13 are of some significance and we proceed to detail them. Penterman and his plumbing helper, *80 Kivimage, arrived at house No. 5 at 7:45 A.M. and went into the cellar where Penterman laid out the work Kivimage was to do. This consisted of connecting up the boiler to the pipes of the baseboard heating system already installed on the first floor. These pipes, 3/4" in diameter, passed through the floor into the cellar through 1 1/4" holes, and were to be joined to the boiler pipes by solder fused by an acetylene torch. After Penterman had finished his instructions he went upstairs and met the floor finishers, Beaton and the decedent Bergquist, his employee. Penterman testified he spoke with Bergquist who said to him, "George, we're really pushing you on this job," to which he replied that he didn't think they were since they could not do the job that day because the decorating (painting) was not completed. Penterman then left the premises and drove away. He said that Beaton and Bergquist also drove off in their truck. Penterman did not return to the house until after the accident.
Mrs. Wood testified she saw Beaton in the street "coming from House No. 5" that morning, and when he inquired, "Is this the house?" she said, "Yes, this is it." Beaton himself could not remember seeing Mrs. Wood that morning or speaking with her, nor could he remember being at the house earlier in the day, or the conversation between Penterman and decedent. However, Penterman testified that when he was at the company office the following day he overheard a conversation between Potter and Mrs. Wood, in the course of which she said she had sent Beaton back on the job after he had left house No. 5.
Beaton recalled arriving at the house between 10 and 10:30 A.M. and seeing the Penterman truck parked there and Kivimage on the premises. Beaton and the decedent began sanding the floors. Kivimage knew of this operation because he saw one of the men operating a machine when he came up from the cellar to get materials from the truck, and he said he heard the machines from time to time during the course of the morning as he worked in the cellar. The floor sanding having been completed and the house swept, *81 decedent went outside to mix floor lacquer and a thinner from cans clearly marked "Caution. Inflammable Mixture. Do not use near fire or flame." Decedent then brought the mixture into the house in two buckets and he and Beaton began lacquering the floors. Beaton testified he knew the materials were flammable and should not be used near fire. He also knew Kivimage was in the house and that a plumber had to use a torch to anneal pipes. However, he said he did not go to see whether the plumber was in the cellar, nor (he believed) did decedent; had he known the plumber was going to use a torch he would have gone and told him of the lacquering operation.
Beaton further testified that in his floor finishing work in the various houses of the Point Pleasant development he used either lacquer or a sealer known as "Gymseal" which he believed was not flammable. He said he and decedent were applying lacquer on the afternoon of October 13, and had used the same type of flammable lacquer on 75% of the Point Pleasant houses over the eight- or nine-week period preceding that date, the period decedent worked for him.
It would appear that the windows in the three bedrooms where the lacquering was being done were closed and that some of the windows in the living room may have been open. The man painting the kitchen sash and trim on October 13 testified he smelled the lacquer fumes and opened a kitchen window. Beaton testified that the usual procedure on a day like October 13 was to throw the windows open to get a good circulation of air during the lacquering operation. That was also the expert testimony of a building contractor, who said, further, that it was a standard safety practice not to use blow torches and flames when lacquer was being applied "unless real precautions are taken and it is an emergency." He also stated that the accepted method used by plumbers was to place a piece of asbestos or tin between the beam and the pipe that was being soldered or sweated, to prevent charring the beam.
The explosion occurred about 2 P.M. while decedent was lacquering the front corner bedroom. At that moment *82 Kivimage was working in the cellar underneath the rear center bedroom and was standing on a four-foot stepladder fluxing a joint. The cellar windows were open. He had lit an acetylene torch with a 1/2" flame and placed it on top of the ladder about four feet from the cellar ceiling. He testified he had not yet applied any flame to the pipe joint when suddenly there was an explosion. Kivimage further stated that he knew generally the kind of work Beaton and decedent did  sanding and applying sealer and lacquer  but did not know "exactly what they do, what way they work * * * what they use, I wouldn't know that. I have no idea." In answer to a specific question, he stated he did not know that the sealer or lacquer was being applied to the floor upstairs while he was working in the cellar.

II.
We have comprehensively outlined the factual background of the appeal in light of the well settled principle that on a motion for involuntary dismissal the trial court must accept as true all evidence supporting the position of the party against whom the motion is made, and must give him the benefit of all inferences in his favor that may logically and legitimately be drawn therefrom. O'Donnell v. Asplundh Tree Expert Co., 13 N.J. 319, 328 (1953).
Plaintiff makes the dual argument that (a) defendant Point Pleasant, as landowner in possession and control of the premises, is liable to a workman for injuries resulting from a hazardous condition upon the premises, and (b) it was negligent in so coordinating the work that a plumber should be working with a torch in proximity with floor finishers working with flammable lacquer. She contends that the proofs at the close of plaintiff's case warranted the submission of the question of the company's liability on both theories to the jury. Defendants Penterman and Kivimage join in that argument.
The general rule is that an owner or occupier of premises who, by invitation, express or implied, induces a *83 person to come upon the premises, is under a duty to exercise ordinary care to render the premises reasonably safe for the purposes embraced in the invitation. Phillips v. Library Co., 55 N.J.L. 307, 310-311 (E. & A. 1893); Mayes v. Splitdorf Electrical Co., 94 N.J.L. 460, 462 (E. & A. 1920). Point Pleasant seeks to escape liability under that rule by arguing the applicability of the exception engrafted upon it by the court in Broecker v. Armstrong Cork Co., 128 N.J.L. 3, 7 (E. & A. 1942): that an owner is not liable where an independent contractor or his employee comes upon lands by invitation "to correct the precise condition which causes the injury." See Gibilterra v. Rosemawr Homes, Inc., 19 N.J. 166, 170 (1955). We do not consider the exception applicable to the instant case. Bergquist's injury and eventual death did not stem from a dangerous condition he was called on to correct, or one which necessarily inhered in the work he was doing. Fire was not the particular hazard involved in the floor-finishing job; the danger was the conjunction of the lacquering with the plumbing work (and its open-flame torch) with which the owner had something to do.
It should be noted that the status of defendant Point Pleasant as owner and possessor of the premises in question is purely incidental. The controlling consideration is negligence  negligence in respect to the conduct of those who were participants, directly and indirectly, at the time and place of the fatal explosion. Cf. Cropanese v. Martinez, 35 N.J. Super. 118 (App. Div. 1955). Bergquist's injury and death were attributable to what was done in the course of completing the plumbing and floor finishing contract work, and not to a physical condition existing on the premises before the employee came upon the scene, as in the cases plaintiff cites: Mayes v. Splitdorf Electrical Co., above, 94 N.J.L. 460 (E. & A. 1920) (unguarded pit in boiler house); Fort v. Reid Ice Cream Co., 98 N.J.L. 559 (E. & A. 1923) (unguarded elevator shaft); Sutton v. Lerner Stores Corp., 10 N.J. Misc. 1126 (Sup. Ct. 1932) (unguarded pit in basement); or Meny v. Carlson, 6 N.J. 82 (1950) (faulty scaffold).
*84 Plaintiff insists that although defendant Point Pleasant entrusted the work at the Oak Park development to independent contractors, it nevertheless retained control of the work through its representatives Potter and Mrs. Wood; that by its "active participation in ordering the various craftsmen to complete the work in house No. 5 on October 13" it "created an unsafe condition on the premises and failed to adequately safeguard the workmen whom it had invited upon the premises."
Generally, one who employs an independent contractor is not liable for injury occasioned by the latter's negligence or that of his employees. Meny v. Carlson, above, 6 N.J. at pages 97-98; 2 Restatement, Torts, § 409, p. 1100 (1934). A number of exceptions and apparent exceptions to this immunity have arisen. An employer will be held for his own wrong, Restatement, above, § 410, p. 1102; he may have been negligent in hiring unskillful and improper persons as contractors, Ibid., § 411, p. 1107; Healy v. Sayre, 113 N.J.L. 308, 311 (E. & A. 1934); giving the contractor poor instructions or faulty equipment, Restatement, Agency, § 213, p. 464 (1933); Torts, § 415, p. 1122; or failing in his duty to inspect the work which the contractor was employed to do, 2 Restatement, Torts, § 412, p. 1114. See, generally, 2 Harper and James, Law of Torts, §§ 26.1, 26.11, pp. 1362, 1405 (1956). The employer of an independent contractor will also be held liable if the work was of a kind which the employer should have recognized would during its progress necessarily create the danger of the mishap which occurred, and thus contained or involved an unreasonable or peculiar risk of bodily harm to plaintiff unless special precautions were taken. 2 Restatement, Torts, §§ 413, 416, pp. 1118, 1128 (1934); cf. Sarno v. Gulf Refining Co., 99 N.J.L. 340, 344 (Sup. Ct. 1924), affirmed per curiam 102 N.J.L. 223 (E. & A. 1925); Terranella v. Union Building & Construction Co., 3 N.J. 443 (1950); Gibilterra v. Rosemawr Homes, Inc., above, 19 N.J. at page 171.
It is not necessary for us to deal with the interesting subject of vicarious liability, where A is held liable to C for *85 damages which B's negligence has caused C, even though A has been free from negligence or other fault  and this because of some relationship between A and B. For the bases in history, reasoning and policy for the imposition of such liability, see Harper and James, op. cit., §§ 26.1 to 26.5, pp. 1361 et seq. (1956); and § 26.11, pp. 1395 et seq., for its application in the case of independent contractors. As is there pointed out, the most common test of a relationship to which the law attaches vicarious liability is control or the general right of control. In such a case the employer is responsible for the negligence of the independent contractor even though the particular control exercised and its manner of exercise had no causal relationship with the hazard that led to the injury, just as in the case of a simple employer-employee situation. Ibid., § 26.3, p. 1366, § 26.11, pp. 1401 et seq., and § 26.7, p. 1374 et seq.; Stevens "Test of the Employment Relation," 38 Mich. L. Rev. 188 (1939). Liability flows not from the concept of employer fault but from the law's policy as to the liability for risks broadly incidental to the enterprise of the employer, whether of an independent contractor in the exceptional situation or of an ordinary employee in the standard situation. Harper and James, § 26.5, p. 1370 et seq. The question is: Is the risk fairly allocable to the enterprise? Ibid., § 26.11, p. 1400.
What we have here, on the other hand, is a case of liability for direct negligence on the part of the employer of the independent contractor  in short, liability for fault by Point Pleasant  whether or not there may also be vicarious liability for the fault of the independent contractor. A specific formulation of the rule applicable in this situation is to be found in 2 Restatement, Torts, § 414, p. 1120 (1934):
"One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for bodily harm to others, for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." (Italics ours)
*86 Under Comment (a) it is noted that
"* * * The employer may, however, retain control less than that which is necessary to subject him to liability as master. He may retain only the power to direct the order in which the work shall be done * * *. Such a supervisory control may not subject him to liability under the principles of Agency, but he may be liable under the rule stated in this Section unless he exercises his supervisory control with reasonable care so as to prevent the work which he has ordered to be done from causing injury to others."
Here the jury could have found that Point Pleasant did control a part of the work, viz., the time when the floor finishing would be done and its coordination with the plumbing work. There was evidence from which it could have reasonably concluded that both the finishing of the floors with flammable lacquer and the use of the open torch flame near the ceiling of the cellar, close by the openings in the floor through which the heating pipes passed, were directed by Point Pleasant to be done on October 13. Here we recall what Penterman said about being directed to finish his work on October 13, as well as the testimony that Beaton had been directed to return to his floor finishing job on that date after he had left the house.
A jury question arose as to whether this control by Point Pleasant was exercised with reasonable care in view of the expert testimony that floor lacquer and an open flame were not safely to be used near each other. There was also the testimony that Point Pleasant, through Potter, knew or should have known that an open flame would be used by the plumber in annealing the pipe joints, and that it knew or should have known that flammable lacquer would be used in view of Beaton's testimony that he had used such lacquer in 75% of the houses in which he had done floor finishing for the company. Cf. Garland v. Townsend, 217 Mass. 297, 104 N.E. 731 (Sup. Jud. Ct. 1914); Reid v. Monmouth Oil Co., 42 N.J. Super. 355 (App. Div. 1956).
The principle of liability discussed under section 414 of the Restatement of Torts is treated in another way in Harper and James, op. cit., § 26.11, p. 1405, where it is *87 said that "the employer will of course be held for his own wrong." The authors give this example: "The employer's negligence may also be found in a failure to exercise supervision over, or to perform, some part of the operation which he has not in fact delegated to anybody else under the contract, or which he has in fact assumed to exercise or perform." In the present case the work of coordinating the activities of the several contractors, from the standpoint of the security of their respective employees from risk of injury that might arise because of the work others were doing, was either not delegated to anyone (thus constituting a culpable failure to see to it that such supervision was exercised by someone), or was assumed by Point Pleasant itself and done negligently (or so the jury could have found) in respect to the hazard arising from the simultaneous operations involved, namely, lacquering the floors and annealing the pipes.
Gibilterra v. Rosemawr Homes, Inc., above, 19 N.J. 166 (1955), which the trial court relied on, is not in point. There is nothing in the opinion which suggests control or participation by the owner-developer in any way in the arrangements for the doing of the work there involved, or any other arguable culpable act or default by that defendant. The court did not discuss section 414 of the Restatement of Torts  it did cite sections 413 and 416  and the problem which lies at the heart of this case was not even considered there. Cf. Trecartin v. Mahony-Troast Construction Co., 18 N.J. Super. 380 (App. Div. 1952), which, on principle, required submission to the jury of the question of Point Pleasant's liability under the proofs in the instant case.
We conclude that the trial court erred in granting Point Pleasant's motion for judgment of involuntary dismissal at the close of plaintiff's case.

III.
Turning now to the appeal of defendants Penterman and Kivimage, they claim that plaintiff's proofs failed to show they were guilty of negligence and that their acts were the *88 proximate cause of decedent's death. They further argue that decedent was guilty of contributory negligence and assumed an obvious risk. In the light of the stated principle which controls on a motion for involuntary dismissal, we conclude that the trial court properly submitted to the jury the issues of negligence, proximate cause, contributory negligence and assumption of risk.
The fact that defendant Penterman was absent from the house from the time he left early in the morning after laying out the day's plumbing work for Kivimage until after the explosion, is of no moment. He was the employer of Kivimage, and his responsibility for the latter's acts is, of course, grounded in the doctrine of respondeat superior.
On the question of negligence, the record is clear that Kivimage knew the floor finishers were at work. He saw one of them when he came up out of the cellar, and he heard them running the sanding machines during the morning. He knew generally the type of work floor finishers do. The jury could have found that he knew or had reason to know they applied some sort of sealer or lacquer as a floor finish following the sanding, and that as a reasonable man he would have taken precautions with an open acetylene torch flame. From the proofs that the cellar ceiling beams were charred, and the absence of evidence that Kivimage was using an asbestos or tin shield, the jury could have found he was negligent in not following the standard practice testified to by the building expert, that such a shield was the accepted method of procedure.
It is the traditional duty of the plaintiff in a negligence case to prove causal relation. There was enough in the case, both at the close of plaintiff's proofs and at the close of all the evidence, from which a jury could have concluded that Kivimage's torch ignited the lacquer fumes. Plaintiff was not obliged to establish proximate cause by direct, undisputable evidence. "The matter may rest upon legitimate inference, so long as the proof will justify a reasonable and logical inference as distinguished from mere speculation." Beyer v. White, 22 N.J. Super. 137, 144 *89 (App. Div. 1952). A weighing of the evidence is not permitted on a motion to dismiss. As was said in Stanley Co. of America v. Hercules Powder Co., 29 N.J. Super. 545, 554 (App. Div. 1954), reversed on other grounds, 16 N.J. 295 (1954):
"* * * If the record presents any evidence which would cause fairminded men to differ as to whether there was a reasonable probable relation of cause and effect between a tortfeasor's negligence and the alleged damage, the issue must be submitted to the jury for determination. Vadurro v. Yellow Cab Co. of Camden, 6 N.J. 102 (1950)."
Plaintiff's burden of proving proximate cause can be established by circumstantial evidence. Yormack v. Farmers' Cooperative Ass'n of New Jersey, Inc., 11 N.J. Super. 416, 424 (App. Div. 1951); Wegiel v. Hogan, 28 N.J. Super. 144, 156 (App. Div. 1953). The facts here logically and legitimately permitted an inference by the jury that the lacquer fumes were caused to explode by the open flame Kivimage was using near the cellar beams. Defendants suggest that the explosion may have been caused by the painter or the floor finishers smoking, although there is no testimony they were smoking while the lacquering work was going on. There is also a suggestion that the fumes might have been sparked by an electrical connection, although the testimony indicates the cables of the sanding machines had been disconnected at the time. But all this was for the jury, and before it could grant an award it had to be satisfied by the preponderance of the evidence that the hypothesis of causal connection advanced by plaintiff (the torch flame) between Kivimage's acts and decedent's injury and death was more reasonably probable than any other hypothesis (smoking or electrical spark) as to cause. Stanley Co. of America v. Hercules Powder Co., above, 29 N.J. Super. at page 554.
As for the issue of contributory negligence, it is to be observed preliminarily that where an injured person has lost his life as the result of an accident, there is a presumption he used due care for his own safety. Tate v. *90 Costa, 29 N.J. Super. 527, 531 (App. Div. 1954); Bergmann v. Public Service Ry. Co., 98 N.J.L. 487, 488 (E. & A. 1923). It is also well settled that in order to justify dismissal of an action upon the ground of contributory negligence, plaintiff's negligence "must appear clearly and conclusively as a fact or as the necessary and exclusive inference that would be drawn by all reasonable men in the exercise of a fair and impartial judgment." Bacak v. Hogya, 4 N.J. 417, 426-427 (1950); Battaglia v. Norton, 16 N.J. 171, 178-179 (1954). While it might be argued Beaton knew that Kivimage was on the premises and should have known he might possibly use a torch while down in the cellar, such knowledge cannot as a matter of law be imputed to decedent. Lechman v. Hooper, 52 N.J.L. 253 (Sup. Ct. 1890); Farrell v. Diamond Alkali Co., 16 N.J. Super. 163 (App. Div. 1951). There is absolutely no proof to show decedent knew Kivimage was on the premises at the time of the lacquering operation, or that he was to use a torch in connection with his work. As to whether the floor finishers were working with windows entirely closed and no cross-ventilation, there was a factual issue presented for jury determination not only as to the lack of such ventilation but also as to whether this condition contributed to the explosion.
On the question of assumption of risk, here again, any knowledge possessed by Beaton as to Kivimage's presence on the premises or that he might use an open flame cannot, on a motion for involuntary dismissal, be imputed to decedent. The conditions of which decedent was aware cannot be said to have suggested to him a clear and present danger from the lacquering work he was then doing. It is only where the evidence or the logical and legitimate inferences that can be drawn therefrom show clearly that decedent would actually appreciate the danger, that a judgment of involuntary dismissal should be granted. Laragay v. East Jersey Pipe Co., 77 N.J.L. 516 (E. & A. 1909).
On the facts of the instant case, the inference of knowledge of a known or obvious danger cannot as a matter of law be attributed to decedent. A plaintiff will not be *91 held to have assumed a risk of danger unless he actually appreciated the danger or unless an ordinary prudent person in his position and with his experience would have appreciated it. Klinsky v. Hanson Van Winkle Munning Co., 38 N.J. Super. 439, 445 (App. Div. 1955). He not only must have knowledge of the physical surroundings which create the danger, but must comprehend and appreciate the danger. Beck v. Monmouth Lumber Co., 137 N.J.L. 268 (E. & A. 1948).
The granting of Point Pleasant's motion for judgment of involuntary dismissal is reversed, and the denial of the motions made on behalf of Penterman and Kivimage is affirmed.