54 N.J. Super. 419 (1959)
149 A.2d 288
MAJESTIC REALTY ASSOCIATES, INC., AND BOHEN'S, INC., PLAINTIFFS-APPELLANTS,
v.
TOTI CONTRACTING CO., INC., A CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT, AND PARKING AUTHORITY OF THE CITY OF PATERSON, NEW JERSEY, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued November 17, 1958.
Decided March 6, 1959.
*422 Before Judges GOLDMANN, FREUND and HANEMAN.
Mr. Joseph J. DeLuccia argued the cause for plaintiffs-appellants (Mr. Edward G. Weiss, attorney).
Mr. Irving C. Evers argued the cause for defendant-respondent (Mr. George A. Vaccaro, attorney; Mr. Evers on the brief).
The opinion of the court was delivered by FREUND, J.A.D.
Plaintiffs, Majestic Realty Associates, Inc. (Majestic), owner of the two-story premises at 297 Main Street, Paterson, and Bohen's, Inc., a retail drygoods establishment occupying the first floor and basement thereof, appeal from a final judgment of dismissal entered in the Superior Court, Law Division, in favor of one of the defendants, Parking Authority of the City of Paterson.
Plaintiffs' claims against the defendant Toti Contracting Co., Inc. (Toti), an independent contractor, were tried and thereafter submitted to the jury. It returned a verdict of $11,200 for Majestic and of $12,700 for Bohen's. Toti does not appeal. The propriety of the dismissal in favor *423 of the Authority, entered at the close of plaintiffs' case, is the subject of this appeal.
The action was brought to recover damages caused to Majestic's building and to Bohen's merchandise by reason of the collapse of a wall in the process of demolition. Prior to October 26, 1956 the Authority entered into a contract with Toti for the demolition of several buildings south of Majestic's building, including the three-story structure immediately adjacent thereto on the south, 299 Main Street. Main Street is one of the principal business arteries of the city, and the area, prior to the demolition work, was completely built up. The buildings to be demolished included several on Main Street, from the Majestic building 50 or 60 feet to the corner of Ward Street, and then several others continuing east on Ward Street for 150 feet. The buildings were to be demolished for the use of the land by the Authority as a public parking area. Except for 299 Main Street, most of the razed structures were one-story buildings.
Toti began the demolition work at Ward Street and worked in a northerly direction toward the plaintiffs' building. When it reached 299 Main Street, the last building remaining intact, Toti first removed the roof, far side walls, and interior partition work, leaving the entire northerly wall unsupported and free-standing. The wall was composed of brick and masonry. It extended 20 feet above the roof of the Majestic building along the full 40-foot length of the latter.
George W. Patterson, manager of Bohen's, testified that on October 26, 1956 Toti's superintendent in charge of the job came into his store and said: "I think you better leave because we have an awful problem." Patterson replied that he would take the clerks across the street. He testified that the crane was moved down Main Street with no police protection or roping off of the street or sidewalk. He said "the street was a mess; it was a nuisance, a hazard."
Toti undertook to remove the last-remaining wall by using a crane from which was suspended a 3,500-pound wrecking ball. The crane remained in the street, and the *424 ball was swung over the plaintiffs' property. At first Toti's operator swung the ball at the very top of the wall, intending to reduce it by knocking off a few bricks at a time onto the Authority's lot to the south. Operations then stopped for about five minutes. When they resumed, the operator swung the ball at a point some 15 feet below the top of the wall. The impact caused the uppermost section of the wall to fall back in the direction from which the ball had been swung. A 15' x 40' section fell onto the roof of the Majestic building, causing a 25' x 40' break in the center of the roof. Charlotte S. Dunn, an employee of Bohen's who saw the wall collapse, testified that she asked the crane operator: "What did you do to our building?" He replied: "I goofed."
Since October 26 was a cloudy day, "tarps" were extended over the roof. It rained on October 27. The "tarps" were pitched tent-like so that the water would run off the side of the building. On November 2 the area experienced its "hardest rainstorm * * * in years." Despite the "tarps" the rain came through the roof, causing the inventory damage for which Bohen's sought recovery.
In answer to plaintiffs' interrogatory as to what precautions had been taken to prevent the wall from falling, Toti's president stated:
"All persons were removed from premises of Bohen's in anticipation of knocking down the north wall. The roof and third floor were razed so that there would be no structure on the south side of the north wall above the level of Bohen's building which would cause pressure against the north wall from the south side. North wall was left standing free so that it could be pushed over southerly. Police controlled road traffic and sidewalk was roped off."
George Patterson also testified that during the week before the accident, "* * * every time the ball hit one of their walls, all the walls were together on Main Street, and our building rocked every time they hit it causing dirt, falling debris during that time."
At the conclusion of plaintiff's case, which included the testimony of a professional engineer to be discussed infra, *425 the Authority moved for a directed verdict on the ground that there was no evidence or suggestion of culpability on its part and that it was free from liability under the doctrine absolving the general employer from liability resulting from the negligence of an independent contractor. Plaintiffs resisted the motion, contending that demolition work is an extra-hazardous activity which a landowner cannot, with impunity, delegate to an independent contractor. In granting the motion and dismissing the complaint against the Authority, the trial judge ruled:
"Now, there is no question at all over the fact that this was a hazardous operation. I mean, without any testimony that is a matter of common knowledge, but I don't see where there was anything involving a public nuisance. And even if there was, this loss didn't come about by reason of that fact. The loss was occasioned by reason of actual negligence on the part of somebody in the performance of the work, and in that situation I don't see how the owner or the person in control of the property can possibly be held under our cases."
In seeking a reversal, plaintiffs urge that the independent contractor bar is unavailing for four reasons: (1) demolition work is "inherently dangerous" or a "nuisance per se"; (2) the Authority is nevertheless liable because it retained control over the work; (3) the Authority is liable for its own negligence in failing to exercise control; and (4) the Authority was negligent in hiring an incompetent contractor.
Before addressing ourselves to the first and central issue of the case, we shall dispose of plaintiffs' three remaining contentions.
Plaintiffs argue that the Authority, in its contract with Toti, reserved the right to control the manner and method of doing the work. They do not contend that the Authority did in fact direct the manner in which Toti performed the work. Where a landowner reserves to himself the right to control and direct the manner in which work is to be done, the law fastens a vicarious liability upon such landowner for tortious injuries caused by his contractor, *426 even though the power so reserved in the contract is not exercised. Trecartin v. Mahony-Troast Construction Co., 18 N.J. Super. 380 (App. Div. 1952); Bergquist v. Penterman, 46 N.J. Super. 74, 85-87 (App. Div. 1957). The retention of only such general superintendence as is necessary to ensure that the work is performed in accordance with the contract, however, is insufficient to subject the landowner to liability for the contractor's negligence. Trecartin v. Mahony-Troast Construction Co., supra; Bergquist v. Penterman, supra; Giroud v. Stryker Transp. Co., 104 N.J.L. 424 (E. & A. 1928). Plaintiffs cite numerous provisions of the contract to document the proposition that the Authority in this case retained the right to control the manner of doing the work. A detailed recital of these terms is unnecessary. None indicates that the Authority, its engineers or inspectors were to supervise the method of demolition or construction to be followed. To the contrary, the contract specifically provides: "Inspectors will not, in any way, interfere with or attempt to control the organization or method of procedure adopted by the Contractor, * * *." The Authority had no right to control or direct the operation of the work. It follows that there was no negligence in failing to exercise such control.
Plaintiffs also urge that there was sufficient evidence that the Authority was negligent in hiring an inexperienced and incompetent contractor to raise a jury question. Plaintiffs' counsel concedes that the proof to establish this point was "meager." In our judgment, the case was devoid of proof to establish a negligent hiring. The evidence of Toti's acts of negligence after it commenced work on the project does not permit the conclusion that the Authority was negligent in engaging Toti in the first instance. Indeed, it appears that Toti previously had two comparable contracts, one involving the demolition of three buildings in Fairview and another involving the demolition of eight or nine buildings in Hackensack. These are both urban communities. The record contains no other indication of Toti's ability and experience. We are satisfied that plaintiffs *427 failed to bear the burden of proving any impropriety in employing Toti. See Sarno v. Gulf Refining Co., 99 N.J.L. 340, 342-43 (Sup. Ct. 1924), affirmed 102 N.J.L. 223 (E. & A. 1925); Annotations, 8 A.L.R.2d 267 (1949), 30 A.L.R. 1502, 1545 (1924).
We turn then to the principal question involved on this appeal  whether the demolition of a row of buildings in a highly built-up metropolitan community constitutes, under the circumstances of this case, the kind of activity so hazardous or inherently dangerous as not to permit the landowner to be relieved from liability for damage caused by the negligence of an independent contractor. The Parking Authority does not dispute plaintiffs' legal theory, but only the premise that the activity here involved can rightfully be deemed hazardous or inherently dangerous. Before moving to this crucial fact question, however, we find it desirable to review some of the authorities that sustain the legal proposition.
Preliminarily, it is necessary to distinguish between the rule here in question and that which holds one, normally a landowner, absolutely liable for damage caused by his ultra-hazardous activities, regardless of whether he has exercised reasonable or a high degree of care. The latter doctrine had its origin in the old English case of Rylands v. Fletcher, L.R. 3 H.L. 330, 37 L.J. Ex. 161 (1868), where the landowner constructed a reservoir on his land and the water escaped and damaged a neighbor's property. Liability ensued notwithstanding no negligence had been proved. The doctrine has been recognized in the United States. Restatement, Torts, §§ 519-524; 2 Harper and James, Law of Torts, § 14.1, p. 785 et seq. (1956). Although the Rylands doctrine has not been adopted in New Jersey, Marshall v. Welwood, 38 N.J.L. 339 (Sup. Ct. 1876); De Gray v. Murray, 69 N.J.L. 458 (Sup. Ct. 1903); Smith v. Okerson, 8 N.J. Super. 560, 564 (Ch. Div. 1950); Prosser, Torts (2d ed. 1955), § 59, pp. 332-33, a similar rationale was adverted to in McAndrews v. Collerd, 42 N.J.L. 189 (E. & A. 1880), involving the keeping of *428 explosive substances in large quantities, an activity there termed a "nuisance per se."
Nevertheless, owing to the lack of unanimity in this and other jurisdictions as to the proper formulation of the concept which we for the moment refer to as the "inherently dangerous" exception (to the rule of nonliability), we are still confronted with a problem in analysis. We discern at least three approaches in terminology, and we are not at all certain that any of the three was intended to apply to factual situations of which the other two were not also descriptive. See 2 Harper and James, op. cit., supra, § 26.11, p. 1409, n. 62. The Restatement, Torts, articulates two of these approaches. Section 416 refers to work which the employer should recognize as necessarily requiring the creation during its progress of a condition involving a peculiar risk of harm to others unless special precautions are taken, as resulting in the employer's liability if the contractor was negligent and such harm occurs. (The rule set forth is limited to cases of bodily harm, but since the problem is to adjudge the dangerous propensities of the activity involved, we perceive no logically valid reason for basing distinctions upon the nature of the injury which does in fact happen to occur.)
Section 835(e), on the other hand, holds the employer of an independent contractor liable for damage to another's land if "the activity is inherently dangerous and the independent contractor carries it on in a negligent manner * * *." The comment to subsection (e) defines an inherently dangerous activity as "an activity which can only be safely carried on by the exercise of special skill and care, and which involves a grave risk of serious harm if unskillfully and carelessly done."
Finally, the phrasing found in most of the early cases in this jurisdiction has been in terms of "nuisance per se." See, e.g., Cuff v. Newark and N.Y.R. Co., 35 N.J.L. 17, 22 (Sup. Ct. 1870); Sarno v. Gulf Refining Co., supra; Mann v. Max, 93 N.J.L. 191 (E. & A. 1919); Healy v. Sayre, 113 N.J.L. 308 (E. & A. 1934); Terranella v. *429 Union Bldg. and Constr. Co., 3 N.J. 443, 446-47 (1950); Bacak v. Hogya, 4 N.J. 417, 425 (1950). (Parenthetically, we note that two further modes of expression have gained acceptance: that in terms of "non-delegable duties" and that in terms of "intrinsically dangerous activities.")
The term "nuisance per se" we regard as unsatisfactory for present purposes, especially in light of cases like McAndrews v. Collerd, supra, using it interchangeably with "ultrahazardous activity." Indeed, in a recent case our Supreme Court expressed the exception to the general rule of nonliability in terms similar to those of § 416 of the Restatement. In Gibilterra v. Rosemawr Homes, 19 N.J. 166, 171 (1955), it is said:
"And the proofs do not bring the case within the exception to the general rule which subjects the owner to liability if the work was of the kind which Rosemawr should have recognized would during its progress necessarily create the danger of mishap which occurred, and thus contained or involved an unreasonable or peculiar risk of bodily harm to plaintiff unless special precautions were taken, Restatement, Torts, secs. 413, 416, pp. 1118, 1128 (1934). The mere making of a trench with a steam shovel is not work which would necessarily give rise to an unreasonable or peculiar risk of the collapse of a sidewall upon workmen in the trench, and there is no showing to justify the inference that Rosemawr knew or should have known that danger of a collapse of the trench inhered in the soil in which the trench was dug. See Terranella v. Union Bldg. & Construction Co., 3 N.J. 443 (1950); 57 C.J.S., Master and Servant, § 590, p. 362 (1948)." (Emphasis supplied)
See also Bergquist v. Penterman, supra, 46 N.J. Super., at page 84 (App. Div. 1957).
Of course, the facts of the Gibilterra case would not have given rise to liability on the part of the landowner under any of the formulae cited above, and we do not understand the Supreme Court to have adopted the exception to the general rule there cited to the exclusion of other tests of the liability of a landowner. The holding of that case does not indicate a narrowing or broadening of the scope of a landowner's liability.
There is difficulty in the practical application of each of the rules cited above. See 2 Harper and James, op. cit., *430 supra, § 26.11, p. 1409, n. 62. The vagueness of such terms as "nuisance per se" or "inherently dangerous" is obvious. And while the formula which finds liability if the work done was such that the landowner should have realized that it necessarily created a risk of the mishap which occurred unless special precautions were taken, seems to offer a more workable test, on reflection its apparent practicality becomes illusory. How are we to distinguish activities which create a risk unless special precautions are taken from those which become dangerous only when the actor fails to take the precautions called for by the nature of the work? The latter formulation does no more than spell out the ordinary negligence of a contractor where the landowner is generally not liable, while the prior phraseology purports to establish the landowner's liability under an exception to this general rule. To illustrate: assume that both the landowner and the contractor knew that the soil condition on the land involved in the Gibilterra case was such as to make likely a collapse of the trench unless the sidewalls were supported. If as a result of the contractor's failure to support the trench it collapses and injures the man working in it, is the landowner liable? It would seem that the latter would be justified in relying on the contractor's taking the reasonable precaution which would have made the operation no more dangerous than any other construction project, and that the normal insulation from liability for the negligence of an independent contractor would prevail. But we can as readily say that this was a situation fraught with an unreasonable risk of harm to the workman unless the contractor took the special precaution of supporting the walls of the trench. By changing the phraseology, the landowner has been brought within the exception to the rule and is rendered liable.
Nor can we distinguish cases which would give rise to a landowner's liability by limiting them to situations requiring a "high" amount of care, as opposed to "reasonable" care. For the essence of "reasonable care" is care commensurate with the risk involved, and in certain situations *431 any failure to exercise the highest amount of care is the equivalent of a failure to exercise reasonable care. See Ambrose v. Cyphers, 29 N.J. 138 (1959). To say that a landowner is not liable simply because an activity is dangerous if reasonable precautions are omitted, but is liable if the activity is dangerous unless the highest amount of care is exercised, would force courts and juries to make what frequently would be an impossible distinction. Consider the present case where reasonable care requires that the brick wall be knocked down row by row, using great care that the steel ball not hit too low on the wall. If we assume (contrary to the actual facts of the case, as discussed infra) that if a competent contractor were to undertake the work in this manner, the danger of a mishap would be no greater than that involved in any less complex construction project, how can we characterize the project as dangerous unless a high amount of care is used, or not dangerous unless reasonable care is omitted? The two standards are identical.
In our view the most workable and the fairest rule is that the landowner is liable for the negligence of an independent contractor if the activity was such as would necessarily create a danger of the mishap which occurred, regardless of the contractor's exercising reasonable care. The quality distinguishing "inherently dangerous" activities from others is the probability that injurious consequences will attend their performance even if reasonable care is exercised. This formulation will not force every landowner to become a construction expert in order to determine what, if any, "special precautions" are required to render the project nonhazardous. Provided he has not negligently engaged an incompetent contractor (see above), he can rely on the contractor's expertness and his taking the precautionary steps required by the circumstances. It is only when these precautions still leave others imperiled by the job that the landowner is required to account to those damaged by his undertaking. Nor should we be understood to say that damage must inevitably follow from the work being done, *432 notwithstanding the exercise of reasonable care. It is sufficient if there is a substantial risk thereof, recognized by those skilled in the field.
Charging liability to the landowner does not impose an unreasonable burden on him. As a matter of justice, there is little to be said for a rule which leaves an innocent plaintiff remediless while the owner, who by hypothesis is held to have anticipated the harm which has occurred, is free to disclaim responsibility by having entrusted the work to a contractor. In practice, the burden will be slight indeed, for the owner is in a position to shift the loss either by risk-distributing insurance or by providing in the agreement with the contractor that he will be indemnified by the latter if held answerable for the loss. See Restatement, Torts, § 416, comment (b). It is only when neither course is pursued and when the contractor who has been engaged is not financially responsible that the owner will be compelled to bear the burden himself.
There is a conflict in the decided cases as to whether demolition work in a crowded city section may be an "inherently dangerous" activity. Most of the cases are collected in Annotation, 33 A.L.R.2d 89, 92-95 (1954). One of the two cases there cited in support of the negative view, Engel v. Eureka Club, 137 N.Y. 100, 32 N.E. 1052 (Ct. App. 1893), is no longer considered as representing the New York approach. In Hanley v. Central Savings Bank, 255 App. Div. 542, 8 N.Y.S.2d 371 (1st Dept. 1938), affirmed 280 N.Y. 734, 21 N.E.2d 513 (Ct. App. 1939), it was said, without reference to the Engel case, "Demolition of a building in a crowded section of a City should be considered as inherently dangerous. Restatement of the Law of Torts, Sections 412-416." Janice v. State, 201 Misc. 915, 107 N.Y.S.2d 674 (Ct. Cl. 1951), is an extremely well-considered opinion following Hanley and distinguishing Engel as not involving demolition work on a crowded street. 107 N.Y.S.2d, at page 679. In addition, "tearing down high walls" is deemed to be an activity within the exception in Prosser, Torts (2d ed. 1955), § 64, p. 360.
*433 Although there are indications in some of the cases and writings that the issue of whether a certain activity comes within the rule just discussed is for the court, it is our opinion that the issue is a factual one for the jury. See, for example, Whalen v. Shivek, 326 Mass. 142, 93 N.E.2d 393, 33 A.L.R.2d 74 (Sup. Jud. Ct. 1950). While the demolition of a building in an urban area might seem to a court to be obviously "inherently dangerous," to take judicial notice of such facts may lead to a precipitant resolution of the problem. Not only in demolition cases, but wherever the issue arises, the knowledge of a court would be a poor substitute for the testimony of experts in the field. Under a proper charge, as described above, there is no reason why the issue should be beyond the ken of a jury.
At the trial plaintiffs produced William H. Hayford, a professional engineer who had supervised other demolition projects and an on-the-street observer of Toti's operations in this case, to testify as to the established methods of demolishing buildings and to offer his appraisal of the risks involved in the "demolition of a building in an area such as this and adjacent to another." Hayford testified that in an area such as Main Street, Paterson, demolition was "hazardous work," and he later added: "It is one of the most hazardous operations in the building business." The proper procedure for demolishing such a building, he said, was to take it down in small sections so that the work could be done without losing control of the operation. He had no criticism of the method pursued by Toti in the demolition of the smaller buildings. The following appears from the record:
"Q. In your opinion would it be standard practice to leave a wall such as that standing without any support whatsoever? A. Well, it surely would have been safer if, when they got the roof off the building, that they had immediately begun to take the north wall down and never leaving any portion of the north wall standing at a higher point than the interior construction of the building would form a brace."
*434 Hayford further testified that the standard practice for removing a wall such as that which remained adjacent to the Majestic building was to swing the wrecking ball so that it would knock off a few bricks at a time at the extreme top of the wall, and that as soon as there was an attempt to strike the wall any appreciable distance below the top, the inertia of that portion of the wall which was above the point of contact would cause it to fall in the direction from which the blow was struck."
"Q. And the inertia caused it to do that? A. Yes, sir.
Q. Now, had that been done properly, you are telling us, by the slow picking-off of the top or striking off of the top, that would not have involved any risk to the adjacent property? A. I believe that is right, sir.
Mr. Vaccaro: All right. That is all. Thank you.
Re-direct examination by Mr. Weiss:
Q. I believe you also said that if the building had not been standing alone and had some support, the wall wouldn't have come down that way, isn't that correct? A. I did say that, sir, that if they had started and taken off the upper portion of the brick wall before all the lateral partition work had been removed, that the wall would still have had support and probably would not have fallen at all."
On the question of the danger of the collapse of the wall, then, Hayford's testimony was ambiguous. He first characterized the undertaking as one of the most hazardous in the industry, then stated that if the "slow picking-off" method had been employed, there would have been no risk to the adjacent property, but concluded by saying that it "probably would not have fallen at all". That the harm actually occurred from the contractor's failure to exercise reasonable care in the performance of the work is not relevant so long as the injury complained of was not attributable to the contractor's "collateral negligence"  i.e., not related to one of the risks that made the work "inherently dangerous" in the first place. Taken in its entirety, the expert's testimony permitted the jury to find that danger inhered in the work itself as well as in the unskillful manner of doing it. As noted, the trial judge seemed to be of a similar persuasion.
*435 It is, of course, no cause for concern that plaintiffs' expert did not characterize the demolition project in the precise language of the legal test of liability herein approved. We are aware of no rule or practice that jury questions are presented only when the expert witness takes a flat position that the applicable legal standard is satisfied by the facts of the case. Indeed, such an expression of opinion by the expert was long thought to usurp the function of the jury. And courts that do not balk at questions on the ultimate issue as such may nonetheless condemn questions designed to elicit whether some activity or conduct measures up to the legal criterion or standard. See McCormick, Evidence (1954), § 12, p. 27, n. 16. We therefore cannot hold that plaintiffs failed to present a jury question simply because Hayford did not say in express terms that the demolition work necessarily created a danger of the mishap which occurred, regardless of the exercise of reasonable care. Plaintiffs were entitled to all the legitimate inferences from his testimony, and one of these, as the jury could have found from the general tenor of his remarks, was that demolition work created an unreasonable risk of harm to adjacent property, notwithstanding the exercise of reasonable care.
For the foregoing reasons, we hold that the case against the Parking Authority should have been submitted to the jury under instructions embodying the principles herein set forth. The judgment appealed from is reversed, and the matter is remanded for a new trial against the respondent.
HANEMAN, J.A.D. (dissenting).
I am in accord with the legal principles enunciated by my colleagues, as I understand them. However, I am not in accord with the result at which the majority has arrived in applying that law to the specific facts adduced at the trial.
As I read the rule which the majority has established, it is that the landowner is liable for the negligence of a competent independent contractor if the activity was such as would necessarily create a danger of the mishap which *436 occurred, regardless of the degree of care observed. They opine that the rule will not compel a landowner to become so expert in construction work that he will be able to determine whether "special precautions" are necessary to render the particular project "non-hazardous." They hold that the landowner may rely upon the expertise of the contractor and look to him for the observance of such precautionary steps as are made necessary by the work. The liability of the landowner, they say, attaches only where the peril to others necessarily continues even after such precautions are instituted.
If the majority means, by their exposition of the rule, that the landowner's liability attaches only when the work would subject others to a peculiar or unreasonable risk of harm, where the risk would necessarily result from the mere doing of the work by a competent independent contractor and where the risk is not related to the exercise of that degree of care which the circumstances require, then, I am in wholehearted agreement with the rule there stated.
I am fully cognizant of the great development and expansion of tort liability which has occurred in recent years, said to be bottomed upon public policy. Various and divers reasons have been advanced for this metamorphosis, including the capacity of the person causing an injury to absorb the eventuating loss and his ability to distribute that loss among the general public by the purchase of indemnifying insurance for a comparatively small premium. I hasten to raise my voice in opposition to any doctrine which would predicate liability solely upon the ground of the ability of a defendant to purchase insurance. This seems to me to be pure pragmatism. Such a theory is fraught with visible and invisible dangers which may result in an impact upon society far more disastrous than the ill which it seeks to cure. Reduced to a ridiculous extent, such a generalization would lead to the conclusion that in every legal human activity, an actor whose action eventuates in injury shall be liable, without fault or negligence. The mere undertaking would result in liability. Such a result *437 is an unwarranted change in recognized precepts governing that liability. Although liability has not been so predicated in this State, reference to the existence of insurance has been made. Cf. Lokar v. Church of the Sacred Heart, 24 N.J. 549, 570 (1957); Collopy v. Newark Eye and Ear Infirmary, 27 N.J. 29, 40, 58 (1958).
I am satisfied that it was not the intention of Lokar and Collopy, or of the majority here, to suggest that liability arises solely from the ability of the landowner to obtain insurance. I feel compelled, however, to state my convictions on this subject, lest the majority conclusion be misconstrued as an exposition of such ground as a general rule for determining tort liability and my silence be considered an acquiescence in that result. Unfortunately, sections of judicial opinions are frequently cited and considered out of context, with an import never intended. It is to allay that fear and to resolve any doubt in advance that I indict what immediately precedes.
The application of the foregoing principles to the existing facts will be next considered.
It must be remembered that a motion for judgment at the end of plaintiff's case admits the truth of plaintiff's evidence, together with every influence which can be logically and legitimately drawn therefrom in favor of plaintiff, and denies only its sufficiency in law. Melone v. Jersey Central Power & Light Co., 18 N.J. 163 (1955).
Before reviewing the facts of the present case and applying the rule of law to them, it is well to note and keep in mind several fact matters which are not here involved. For example, there is nothing in the record which suggests, or from which one could legitimately infer, that the building which was demolished by Toti was anything but a sound structure prior to the commencement of the demolition work, (this is to say that nothing inhered in the structure itself which would invade the legally protected interests of any person); the demolition of the building was a lawful and reasonable exercise of the property rights enjoyed by the Authority; the facts do not raise any issue concerning the *438 Safety Code for Workers in Construction Industry, R.S. 34:5-1 to 34:5-165. However, I take notice that the Legislature has recognized that walls may be razed en masse, R.S. 34:5-15, without danger to the workmen on the job. Thus, the Legislature recognized that that practice does not involve an unreasonable risk of harm to workingmen, provided the work is accomplished under competent supervision. By fair analogy, the legislative rule is made applicable to the work here involved and one might reasonably conclude, as a matter of law, that the reduction of a wall does not involve a peculiar or an unreasonable risk of harm to others.
Turning then to an examination of the proofs as they stood at the close of plaintiff's case. Plaintiffs had produced one William H. Hayford as an expert witness to testify as to the status of demolition work and the accepted standards of prosecuting such work. Hayford testified that the demolition of a building situate as here is "one of the most hazardous operations in the building business," and that the proper procedure for demolishing such a building was to take it down in small sections so that the work could be done without losing control of the operation.
To describe an undertaking in terms of "most hazardous" is a far cry from saying that "the activity was such as would necessarily create a dangerous mishap which occurred, regardless of the contractor's exercising reasonable care," or that the work was such that it would, in spite of the "precautions [which Hayford described as standard procedure] still leave others imperilled by the job." Thus, Hayford should not be made to say that a "substantial risk" of the mishap existed in spite of the exercise of reasonable care by the contractor. His characterization of the work cannot be construed to meet the tests of the rules under which the landowner's insulation from liability is destroyed. When taken in context with the balance of his testimony, including the quoted portion thereof which follows, it is impossible to fairly and legitimately infer that the work was of such a nature as to necessarily involve the risk of the mishap *439 which occurred. True, negligence, in cases which necessarily involve an unreasonable risk of harm, is an unnecessary element in plaintiff's case on liability. The rule which should apply here assumes that, were the work done most carefully, its performance would not eliminate an unreasonable risk of harm. Hayford's testimony, when read in a light most favorable to plaintiff's position, is merely that Toti was negligent in performing the work entrusted to him. Heyford does not state that the work could not be undertaken without necessarily creating an unreasonable risk of harm. His recognition of a careful method of performing the work is in keeping with the legislative understanding of the nature of construction work in R.S. 34:5-15, supra. He had no criticism of the method pursued by Toti in the demolition of the other buildings. The following appears from the record:
"Q. In your opinion would it be standard practice to leave a wall such as that standing without any support whatsoever? A. Well, it surely would have been safer if, when they got the roof off the building, that they had immediately begun to take the north wall down and never leaving any portion of the north wall standing at a higher point than the interior construction of the building would form a brace."
Heyford testified that the standard practice for reducing a wall, such as that which remained adjacent to the Majestic building, was to swing the wrecking ball so that it would knock off a few bricks at a time at the extreme top of said wall and that, as soon as there was an attempt to strike the wall any appreciable distance below the top, the inertia of that portion of the wall which was above the point of contact would cause it to fall in the direction from which the blow was struck.
Heyford further testified as follows:
"Q. And the inertia caused it to do that? A. Yes, sir.
Q. Now, had that been done properly, you are telling us, by the slow picking-off of the top or striking off of the top, that would not have involved any risk to the adjacent property? A. I believe that is right, sir. (Emphasis supplied)
*440 Mr. Vaccaro: All right. That is all. Thank you.
Re-direct examination by Mr. Weiss:
Q. I believe you also said that if the building had not been standing alone and had some support, the wall wouldn't have come down that way, isn't that correct? A. I did say that, sir, that if they had started and taken off the upper portion of the brick wall before all the lateral partition work had been removed, that the wall would still have had support and probably would not have fallen at all."
Again, Hayford's conclusion that the wall "probably would not have fallen at all" had another procedure been followed, when taken in context with the balance of the question and answer, must lead to the conclusion that if the work had been properly performed, in accord with recognized standards, the danger of the mishap which occurred (the risk of harm) would not have been present in the work.
An examination of the entire testimony of Hayford demonstrates that what he intended to express was (1) that although the demolition work is one of the most hazardous undertakings in the construction business, there is a recognized standard method of procedure to avoid damage; (2) that had Toti pursued that method the resulting mishap would not have occurred, and (3) that even though such standard procedure had not been followed, if Toti had undertaken to demolish the free-standing wall by removing the bricks from the apex rather than by striking the wall 15 feet from the top, the mishap with which we are now concerned would not have occurred. The failure to observe recognized standard procedures in the performance of the work points to negligence and not to dangers which inhere in the work and which, because of their constancy, involve an unreasonable or peculiar risk of harm to some legally protected interest without regard to the degree of care exercised.
The gist of this expert's testimony is that buildings can be safely demolished without necessarily subjecting the neighboring property to an unusual risk of harm, provided the contractor observes the recognized standards of procedure to effect the demolition and, further, that Toti could have removed the particular wall without subjecting the neighboring *441 properties to an unusual or peculiar risk of harm by following the practice which he described. The conclusion to be drawn from this testimony is that the work of demolishing buildings does not, of itself, necessarily engender the danger of the mishap which occurred. It follows that such work does not involve an unreasonable or peculiar risk of harm to the adjoining lands and that the landowner is not liable merely because he has ordered the work done.
The proofs demonstrate that the risk of harm arose not from the nature of the work undertaken but from the negligent performance of the work by the contractor. It is difficult to conceive of a situation which will not subject some person or thing to an unusual or peculiar risk of harm if the work is not prosecuted with the requisite degree of care. In the construction field such dangers would be present in both construction and demolition work. But that situation is a far cry from the principle enunciated in Gibilterra (19 N.J. 166) and in this opinion. To say that the work will subject some third person's rights to an unreasonable risk of harm, where the work is not prosecuted with the requisite degree of care, is not to say that the work is of such a nature as to cause one to recognize that it would necessarily create the danger of mishap which occurred, or that it would necessarily subject some third person's rights to an unreasonable or peculiar risk of harm.
I hold that the Authority is not liable under the general rule and I vote to affirm.