72 N.J. Super. 146 (1962)
178 A.2d 57
MARGARET MARION, ADMINISTRATRIX AD PROSEQUENDUM OF THE ESTATE OF MICHAEL MARION, DECEASED, JOHN FERRARA AND RAYMOND ALEXANDER, PLAINTIFFS-APPELLANTS,
v.
PUBLIC SERVICE ELECTRIC & GAS COMPANY, A NEW JERSEY CORPORATION, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued September 25, 1961.
Decided February 2, 1962.
*149 Before Judges GOLDMANN, FOLEY and LEWIS.
Mr. Charles Rodgers argued the cause for appellants (Messrs. Breslin and Breslin, attorneys).
Mr. Theodore W. Geiser argued the cause for respondent (Messrs. Shaw, Pindar, McElroy, Connell & Foley, attorneys; Mr. Geiser, of counsel).
*150 The opinion of the court was delivered by LEWIS, J.A.D.
Plaintiffs appeal from an order granting defendant's motion for involuntary dismissal at the close of plaintiffs' case. R.R. 4:42-2(b). In reviewing the correctness of that determination, we must accept as true the evidence adduced at the trial, and give to plaintiffs the benefit of all legitimate inferences to be drawn therefrom. Melone v. Jersey Central Power & Light Co., 18 N.J. 163, 170 (1955); J.L. Querner, etc., Inc. v. Safeway Truck Lines, Inc., 35 N.J. 564, 566 (1961). See also Kopec v. Kakowski, 34 N.J. 243, 244 (1961).
Defendant and the United Engineers and Constructors, Inc. (hereinafter United), had contracted for certain construction work to be performed by United in the erection of the Bergen Generating Station in Ridgefield, New Jersey. The testimony revealed that on October 2, 1957 Michael Marion, John Ferrara and Raymond Alexander, all of whom were boilermakers with considerable experience, were employed by United. On that day, these employees reported for work in the morning. Flanagan, United's general foreman on the job, selected Murphy, another United employee, as "pusher" or foreman of the crew; the men were then ordered to a nearby railroad siding to unload some heavy equipment from flat cars. When the crew arrived at the siding Ferrara noticed a man wearing a yellow helmet with a Public Service emblem on it standing near the freight cars about to be unloaded. He testified he had never seen this man on the job-site prior to that time. Murphy told the men to remove from one of the cars the two halves of a "rotor"  parts of an air preheater assembly. This they proceeded to do with the assistance of a caterpillar crane which bore a Public Service symbol. Ferrara and Alexander observed Murphy and the man wearing a helmet talking together and pointing in the direction of the railroad cars. Neither Ferrara nor Alexander heard what was said.
After the rotor had been unloaded, the crew went to a nearby gondola car in order to remove metal plates or *151 sheets, each weighing approximately three or four tons; they were fabricated sections of the preheater system. These parts were stacked upright in the car, in bundles consisting of eight sections. The bundles were bound together at the top by two metal straps (six inches wide and 3/8 of an inch thick), which were connected, in turn, to the sides of the gondola car by 3/4-inch steel rods welded to the straps on the one end and the sides of the car at the other. They were also held in position by means of wires and wooden wedges. Murphy instructed his men to unload; they used the crane in connection with this project.
Ferrara and Alexander climbed atop the preheater plates to make the necessary hookup with the crane, and started to cut through the metal bindings with an acetylene torch. The straps were not completely severed until the plates had been connected with a bridle and shackle to enable the crane operator to lift them free from the train for deposit on the ground. Alexander stated that he saw several men wearing yellow helmets talking with Murphy during the time that three sections were being successfully transferred. While Alexander was preparing for the removal of the next plate, another member of the crew suddenly yelled a warning that the bundle was starting to spring. Ferrara jumped to safety, and Alexander made an effort to escape impending danger by sliding down and, in doing so, fell to the floor. His right foot was pinned and crushed underneath one of the plates that shifted to a leaning position against the side of the car. He was immediately removed to the hospital. In the ensuing commotion, several men came running to the railroad siding, including, according to Ferrara, a couple of other "Public Service men." Ferrara observed these men talking with Murphy, and pointing toward the car. After five or ten minutes of apparent conversation, none of which Ferrara actually heard, Murphy came over to the crew and told Marion and Ferrara to continue unloading. As the last two plates were being equipped for removal, they fell over the side of the car  "the whole thing just toppled *152 over and buried us [Marion and Ferrara] right into the ground." Marion was killed instantly, and Ferrara sustained severe injuries.
The instant proceedings were commenced in the Superior Court, Law Division, by Margaret Marion, the administratrix ad prosequendum of Michael Marion's estate, and by Ferrara and Alexander. Plaintiffs also presented claims to the Workmen's Compensation Division, and they have a suit pending against the "Air Preheater in New York and the railroad in New York." The contention on this appeal is that the trial court erred in excluding certain evidence, and in granting defendant's motion for an involuntary dismissal. It is pertinent that we examine the relationship between United and the defendant in order to ascertain the existence of any legal duty owing by defendant to plaintiffs  a sine qua non to the imposition of liability for damages.
The general rule applicable to situations similar to the one sub judice was recently set forth in Wolczak v. National Electric Products Corp., 66 N.J. Super. 64, 71 (App. Div. 1961):
"Absent control over the job location or direction of the manner in which the delegated tasks are carried out, the general contractor is not liable for injuries to employees of the subcontractor resulting from either the condition of the premises or the manner in which the work is performed. * * * Nor is his immunity disturbed by the exercise of merely such general superintendence as is necessary to insure that the subcontractor performs his agreement. * * * Of course, specific instances of direct interference which proximately cause injury to the employees of the subcontractor  such as the furnishing of defective materials * * * or the giving of a single authorized direction thwarting the subcontractor's effort to provide safeguards * * *  will heap liability upon the shoulders of the general contractor." (Citations omitted)
The same principle of law obtains when the relationship is that of owner and employees of an independent contractor. Plaintiffs maintain that Public Service (1) reserved in its contract with United the power to exercise direction and control over the employees of United, and (2) in fact did exercise such direction and control.

*153 I.
As stated by our Supreme Court in Majestic Realty Associates, Inc. v. Toti Contracting Co., 30 N.J. 425, 430 (1959), affirming 54 N.J. Super. 419 (App. Div. 1959), "[t]he problem must be approached with an awareness of the long settled doctrine that ordinarily where a person engages a contractor, who conducts an independent business by means of his own employees, to do work not in itself a nuisance (as our cases put it), he is not liable for the negligent acts of the contractor in the performance of the contract," citing Terranella v. Union Bldg. & Construction Co., 3 N.J. 443, 446, 447 (1950); Mann v. Max, 93 N.J.L. 191, 193, 21 A.L.R. 1227 (E. & A. 1919); Cuff, Adm'x v. Newark & New York R.R. Co., 35 N.J.L. 17 (Sup. Ct. 1870), affirmed 35 N.J.L. 574 (E. & A. 1871). See also 57 C.J.S. Master and Servant § 602, p. 374; Texaco, Inc. v. Roscoe, 290 F.2d 389, 391 (5 Cir. 1961).
If Public Service merely reserved a general power to supervise United's work, "for the purpose of seeing that the contract work is done in compliance with the plans and specifications * * *," no liability would attach to it "so long as the supervision related only to the results and not to the method of doing the work." Trecartin v. Mahony-Troast Construction Co., 18 N.J. Super. 380, 386 (App. Div. 1952), affirmed 21 N.J. 1 (1956). The element of control, although a most important factor in determining whether the owner is to be held vicariously liable for injuries to employees of the contractor, "is not the all important thing it is sometimes made out to be and it is not a constant factor." 2 Harper and James, The Law of Torts, sec. 26.11, p. 1401 (1956). For criticism of the control test, see 37 Ore. L. Rev. 88 (1957). This court has indicated that the rationale for holding an employer of an independent contractor liable for the injuries to the latter's employees stems from "the law's policy as to the liability for risks broadly incidental to the enterprise of the employer, * * *. The *154 question is: Is the risk fairly allocable to the enterprise?" Bergquist v. Penterman, 46 N.J. Super. 74, 85 (App. Div. 1957), certification denied 25 N.J. 55 (1957). In order to answer this query, all of the circumstances surrounding the relationship must be scrutinized. Andryishyn v. Ballinger, 61 N.J. Super. 386, 391 (App. Div. 1960), certification denied 33 N.J. 120 (1960).
The cost-plus contract between United and defendant provided that United was to construct the Bergen Generating Station "under your [defendant's] general direction from your plans and specifications * * *." The first numbered paragraph, entitled "Service to be Rendered," stated:
"With respect to this work, we propose to act as your own Construction Department, being guided in all respects by such instructions as you may from time to time give us."
The trial court construed the instrument to denote that United was an independent contractor. There is no reason to disturb that finding.
The interpretation of the contract was for the court to determine. Parol evidence was not introduced in aid of its construction, and its meaning was not a submissible jury question. 3 Williston, Contracts (rev. ed. 1936), sec. 616, pp. 1772-1773. To the same effect, Bedrock Foundations, Inc. v. Geo. H. Brewster & Son, Inc., 31 N.J. 124, 133 (1959); Michaels v. Brookchester, Inc., 26 N.J. 379, 387 (1958), and cases cited. Special terminology was not employed in the agreement, and no competent proofs were offered to show relevant customs in the building trade or industry. Cf. Edge v. Boardwalk Securities Corp., 115 N.J.L. 286, 290 (E. & A. 1935); Deerhurst Estates v. Meadow Homes, Inc., 64 N.J. Super. 134, 153 (App. Div. 1960), certification denied 34 N.J. 66 (1961). The phraseology "general direction," as therein employed, implies that Public Service was to exercise broad supervisory powers only. The mere fact, however, that United proposed *155 to act as defendant's "Construction Department" does not imply that Public Service assumed the right to control United's employees or its method of operation, especially in view of the language that United was to be "guided" by instructions. The word guide is sometimes used as a synonym for advise, negating "any implication of pointing out with authority or directing as a superior, and, in this sense, has been distinguished from `direct' * * *." 39 C.J.S., p. 416. That this is the probable meaning of the word guide in the context of the contract is buttressed by the fact that guide is not used in any other section of the contract. It is noteworthy that the expression "direct," or a variant thereof, does appear in other provisions: United agrees to furnish at its own expense the service of its executive officers "who will direct and oversee the work performed under this agreement"; United undertakes liability insurance "[u]nless otherwise directed by you, * * *." Presumably, the parties understood the meaning of direct and employed that word wherever they felt it conveyed their intention. The verb "guided," therefore, connoted something different from "direct" or "directed" and should not be interpreted to signify that Public Service had retained the right to direct and control United's work. Consequently defendant cannot be held vicariously liable for the damages sustained by plaintiffs. Note, Bergquist v. Penterman, supra; Prosser, Torts (2d ed. 1955), sec. 64, p. 357; 2 Harper and James, op. cit., supra, sec. 26.11, p. 1395 et seq.

II.
Plaintiffs rely strongly upon the principles enunciated in the Bergquist case to sustain their claim that, even if defendant had not reserved the right of control, it had nevertheless actively interfered with and participated in the methods and manner in which the work was to be done. Thus, they argue, defendant is liable for negligence in *156 directing United's employees. In Bergquist Judge Goldmann discussed the doctrine as formulated in 2 Restatement, Torts, sec. 414, p. 1120 (1934), viz:
"One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for bodily harm to others, for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care."
The authors, in 2 Harper and James, op. cit., supra, sec. 26.11, p. 1405, in rephrasing the rule give several illustrations where the employer will be held liable, e.g., for failure to exercise supervision over, or to perform some part of the operation which he has not delegated to anybody else under the contract or which he has, in fact, assumed to exercise or perform. When the owner gives specific instructions which necessarily involve the safety of the contractor's employees, actively interfering with the contractor's supplying of safeguards or participating in the contractor's failure to supply them, an exception subjecting the owner to liability for negligence is recognized. Trecartin v. Mahony-Troast Construction Co., supra, 18 N.J. Super., at p. 389, cited in Bergquist v. Penterman, supra, 46 N.J. Super., at p. 87; 57 C.J.S., Master and Servant, § 602, p. 374. If, on the other hand, there is no proof that the owner was in control of the work-site or took charge of the manner in which the work was to be executed, no liability for injuries to a contractor's employees can be imposed upon him. 20 A.L.R.2d 868, 901. Gibilterra v. Rosemawr Homes, Inc., 19 N.J. 166, 171 (1955).
Alexander and Ferrara testified that throughout the morning of the accident they had observed several men, who wore yellow helmets bearing Public Service insignia, in conversation with their pusher, Murphy, and pointing to the work; and that, afterwards, Murphy issued orders to the crew. Neither witness could identify the "Public Service" men other than by their headgear. Alexander said that he *157 had received orders only from United employees. It was stipulated that a Mr. Henig would testify that he was defendant's timekeeper and was on the job every day, that from time to time other Public Service employees  the chief engineer and the assistant engineer  were on the premises and wore yellow helmets, and that he did not know if they were on the job the day of the accident.
Plaintiffs' reliance on Dierkes v. Hauxhurst Land Co., 80 N.J.L. 369 (E. & A. 1911), is factually misplaced. In that litigation there were habitual conduct and overt acts over a protracted period of time from which the jury could infer agency and authority. In the cases discussed in the annotation, 112 A.L.R. 337, referred to us by plaintiffs, the authorization of the respective agents was inferred from known circumstances; witnesses actually overheard the agent giving orders or observed his participating functions on the job. These decisions presented a jury question as to identity or the scope of authority. Distinguishable facts appear in Hozian v. Crucible Steel Casting Co., 132 Ohio St. 453, 9 N.E.2d 143 (Sup. Ct. 1937); Power v. Beattie, 194 Mass. 170, 80 N.E. 606 (Sup. Jud. Ct. 1907); De Cunto v. Broadway Sav. Bank, 306 Mass. 119, 27 N.E.2d 751 (Sup. Jud. Ct. 1940). The authority of an agent can only be implied from facts, i.e., actual authority circumstantially proved, or evidenced by conduct. 2 C.J.S. Agency § 99, p. 1228. Accord, Sibley v. City Service Transit Co., 2 N.J. 458, 463 (1949); Reynolds Offset Co., Inc. v. Summer, 58 N.J. Super. 542, 557 (App. Div. 1959), certification denied 31 N.J. 554 (1960).
In the case at bar plaintiffs did not prove what authority, if any, the "Public Service" men possessed, what functions were entrusted to them, or for what purpose they were on the premises. It is true that ordinarily questions of agency and the scope of the agent's authority are for the jury. Miller v. Stieglitz, 109 N.J.L. 138, 143 (E. & A. 1932); Antonio v. Edwards, 5 N.J. 48, 52 (1950). A jury question is presented only "where there are disputed facts *158 or where disputed inferences may be drawn from undisputed facts." Price v. Old Label Liquor Co., Inc., 23 N.J. Super. 165, 169 (App. Div. 1952). The record before us is barren of facts, disputed or undisputed, from which it could be implied that the men talking with Murphy had the authority to direct or control United's "pusher" and the members of his crew or the work in progress at the time of the accident. The inference of authority is predicated upon the pyramiding of several supposed inferences: (1) the men wearing yellow helmets were Public Service employees; (2) they had supervisory authority; (3) because they talked with Murphy and pointed in the direction of the work, they gave orders to him; and (4) Murphy's actions were pursuant to instructions allegedly given. There was no testimony as to what was actually or probably said to Murphy. Granted that the first enumerated inference was legitimate, it furnished no support whatsoever for the second, third and fourth. Plainly, the extent of the authority of the yellow-helmeted men to speak for their employer, what they said to Murphy, and the relation of Murphy's reaction thereto in terms of orders he gave, were matters of sheerest speculation falling short of the stature of a legitimate inference in substitution for direct proof. A jury could not legitimately infer agency with implied authority to control the manner and method of United's work from alleged employees' gesticulations limited to pointing in the direction of activity coupled with mere conversation inaudible to witnesses and unascertained in the evidence.
It was not error to exclude the testimony of John J. Gallagher proffered to show supervision and control on prior occasions. The witness had terminated his employment with United some 8 1/2 months before the tragic mishap. The trial judge has discretionary power to exclude any evidence he deems too remote, and his decision in this regard is not reversible "unless it appears manifest that he has made a mistake." Miller v. Trans Oil Co., 33 N.J. Super. 53, 60 (App. Div. 1954), affirmed 18 N.J. 407 *159 (1955). See also Bosze v. Metropolitan Life Insurance Co., 1 N.J. 5, 10 (1948). At the very least, the trial court was entitled to proof that the unloading project in which the plaintiffs were engaged when overtaken by the accident was of the same general character as the construction activities on the premises during the time that Gallagher was an employee. The exclusion of the testimony of Isaac Stewart was not harmful. Through him, plaintiffs sought to establish that the directions given them by Murphy constituted negligence under the circumstances. Even assuming this were so, defendant was not chargeable with such negligence unless the authority of its servants to direct Murphy was proved and unless it was established that they did in fact instruct Murphy and that he acted under their directions.
Lastly, United was engaged in a type of operation that could legally be delegated to an independent contractor without imposing liability on the owner for injuries arising out of the contractor's performance. The settled rule is stated in Mann v. Max, supra (93 N.J.L., at p. 193). The unloading of massive equipment from railroad cars is not "inherently dangerous" nor a "nuisance per se." A danger is not created thereby regardless of reasonable care on the part of the contractor responsible for such an undertaking. Note Majestic Realty Associates, Inc. v. Toti Contracting Co., supra (54 N.J. Super., at p. 428); Araujo v. N.J. Natural Gas Co., 62 N.J. Super. 88 (App. Div. 1960), certification denied 33 N.J. 328 (1960); 2 Restatement, Torts, sec. 427, p. 1147; 4 Restatement, Torts, sec. 835(e), p. 279; Annotations, 23 A.L.R. 984, 1084; Prosser, op. cit., supra, sec. 64, p. 360.
The power of the court to grant a motion for a judgment of involuntary dismissal does not depend upon the total absence of testimony in support of plaintiffs' case. The test is whether there is any testimony from which the jury can reasonably conclude that the facts sought to be proven are established. Wallace v. Delaware River Ferry *160 Co., 127 N.J.L. 513 (Sup. Ct. 1941), affirmed per curiam 130 N.J.L. 216 (E. & A. 1943), certiorari denied 320 U.S. 760, 64 S.Ct. 68, 88 L.Ed. 453 (1943); Township of Parsippany-Troy Hills v. Bowman, 3 N.J. 97, 107 (1949) (concurring opinion); Kurtz v. Oremland, 33 N.J. Super. 443, 457 (Ch. Div. 1954), affirmed per curiam 16 N.J. 454 (1954).
Affirmed.