Ronald GIBSON, Plaintiff-Appellee and Cross-Appellant,

v.

UNITED STATES of America, Defendant-Appellant and Cross-Appellee.

Nos. 76–2490 and 76–2673.

United States Court of Appeals, Third Circuit.

Argued Oct. 17, 1977.

Decided Dec. 15, 1977.

---

S. M. Chris Franzblau, Franzblau, Falkin & Di Marzio, Newark, N. J., for appellee and cross-appellant.

Barbara Allen Babcock, Asst. Atty. Gen., Washington, D. C., Jonathan L. Goldstein, U. S. Atty., Newark, N. J., Morton Hollander, Michael Kimmel, Attys., Civ. Div., App. Section, Dept. of Justice, Washington, D. C., for appellant and cross-appellee.

Before ADAMS and GARTH, Circuit Judges, and LAYTON,* District Judge.

## OPINION OF THE COURT

GARTH, Circuit Judge.

This is the second time we have had this case before us on appeal. Plaintiff Ronald Gibson brought this action against the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671–2680 (1970) [FTCA],[1] having suffered an injury from an assault which occurred on November 5, 1966 at the federal Job Corps Center at Camp Kilmer, in Edison, New Jersey. The Kilmer Center was operated by Federal Electric Company [FEC] under contract with the Office of Economic Opportunity [OEO], an agency of the United States. Gibson filed suit on November 1, 1968 in the District of New Jersey. The district court dismissed the complaint on the ground that the FTCA, 28 U.S.C. § 2680(h), which exempts the United States from tort liability for the assaults and batteries of its employees, prohibited recovery. On appeal, this court reversed, holding that the facts as pleaded (which included an allegation that the United States had operational control of the Center) stated a claim upon which relief could be granted. *Gibson v. United States*, 457 F.2d 1391 (3d Cir. 1972).

On March 17, 1975, after a non-jury trial limited to liability, the district court filed an opinion (dated March 14, 1975) holding that, since the United States did *not* have day-to-day control of the Center, it could not be liable for failing to control Gibson's assailant. The district court, however, went on to hold the Government liable for the negligent acts of FEC's (the contractor's) employees, under the doctrine of *respondeat superior*. Alternatively, it held

---

* The Honorable Caleb R. Layton, 3rd, United States District Court for the District of Delaware, sitting by designation.

1. The relevant sections of the FTCA provide:
Subject to the provisions of Chapter 171 of this title, the district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. 28 U.S.C. § 1346(b).
As used in this chapter and sections 1346(b) and 2401(b) of this title, the term—

"Federal agency" includes the executive departments, the military departments, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States, but does not include any contractor with the United States.
"Employee of the government" includes officers or employees of any federal agency, members of the military or naval forces of the United States, and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation. 28 U.S.C. § 2671.
The provisions of this chapter and section 1346(b) of this title shall not apply to . . any claim arising out of assault, battery . . . . 28 U.S.C. § 2680(h).

the Government liable under the theory that a contractee is vicariously liable for the negligence of its independent contractor when the work performed is "inherently dangerous."

On May 20, 1976, after a bench trial on damages the district court in an unpublished opinion assessed damages at $106,980, but refused to include damages claimed because of Gibson's alleged inability to attain a doctoral degree. The court held that Gibson's ability to realize his professional goals had not been substantially hindered by his injury.

On June 8, 1976 Gibson filed a Rule 52(b) motion seeking reconsideration on the issue of damages. On June 15, 1976 the district court entered judgment against the United States in accordance with its May 20 opinion, but at that time did not dispose of the Rule 52(b) motion.[2]

On September 17, 1976 the district court denied Gibson's Rule 52(b) motion. Both parties timely appealed, Gibson on the issue of damages (at No. 76–2490), and the United States on the issue of liability (at No. 76–2673).

When the district court ruled in favor of Gibson on the issue of liability, it did not have the benefit of the Supreme Court's opinion in *United States v. Orleans*, 425 U.S. 807, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976), which was decided more than a year after the liability trial had concluded. Because we believe that *Orleans* controls, we must reverse, although we do so reluctantly in light of the eleven year history of this case.[3]

## I.

In 1972 our first opinion, at 457 F.2d 1391, set out the factual background in somewhat greater detail than we find necessary to repeat here. Thereafter, the district court's unpublished opinion on liability only made extensive findings of fact, which, as they relate to the issues before us now, are summarized briefly as follows:

### A. *The Accident.*

The Job Corps was created as part of the Economic Opportunity Act of 1964, 42 U.S.C. § 2711 (now 29 U.S.C. § 911), to assist disadvantaged youths by establishing rural and urban centers in which enrollees would participate in educational programs, vocational training, work experience, and other activities. The Director of OEO was authorized to enter into contracts with private contractors for the operation of Job Corps centers. Camp Kilmer was a residential training center for boys, operated by FEC pursuant to a contract with OEO.

Ronald Gibson was employed by FEC as a group leader at Kilmer. As such he lived in the dormitories. On the night of November 5, 1966, one of the enrollees, Andrew Jessie, became involved in several arguments and disturbances. After the second incident, Gibson took Jessie to the duty officer in charge of security, who may have placed Jessie in the security dormitory.[4] Shortly thereafter Jessie returned to Gibson's dormitory and became involved in another disturbance. Gibson instructed the security personnel to leave, and he tried to calm Jessie. Gibson then went to the latrine section. Jessie followed him and stabbed him in the temple with a screwdriver, inflicting severe injuries.

### B. *The Respective Duties of OEO and FEC.*

Camp Kilmer was a federal reservation. There was a permanent OEO on-site repre-

---

2. On August 12, 1976, the United States filed a notice of appeal at No. 76–2310, appealing from the judgment of June 15, 1976. Since the pending Rule 52(b) motion suspended the finality of the June 15 order, *see* Fed.R.App.P. 4, the Government's appeal was taken from a non-final order. The Government so conceded at oral argument. Accordingly, the appeal at No. 76–2310 was dismissed by the Clerk on October 31, 1977, pursuant to Fed.R.App.P. 42(b), per stipulation of the parties.

3. Because we reverse on liability, we do not reach the issue of damages.

4. The evidence and the findings below are not clear as to whether or not Jessie was actually placed in the security dormitory. If he was placed there, however, he did not remain so confined.

sentative at the Kilmer Job Corps Center, and a project manager in Washington. The OEO had broad supervisory authority over Camp Kilmer, and many aspects of the Camp's operation were subject to OEO approval. The OEO was solely responsible for choosing enrollees,[5] and for approving center staffing. Nevertheless, as found by the district court (Finding of Fact No. 6, Dist. Ct.Op. of Mar. 14, 1975, at 8, Appendix at 14a), *control over the Center's day-to-day operations resided in FEC.*

C. *Security at the Kilmer Center.*

At the time of Jessie's assault on Gibson, FEC had four or five unarmed, civilian security employees assigned to each shift. These security officers were not empowered to make arrests. One security dormitory at Kilmer was used to segregate enrollees who created disciplinary problems. That dormitory was identical to the other dormitories and had no special security features, bars, or locks.

Under its contract with OEO, FEC was responsible for taking "all reasonable steps and precautions to prevent accidents and to protect the life and health of Contractor [FEC] . . . personnel performing or in any way coming in contact with the performance of . . . this contract. . . ." (Part XIX of Contract).[6] FEC had authority to remove physically from the Center any enrollee causing disciplinary problems.

OEO also disseminated guidelines for controlling the conduct of the enrollee corpsmen. In Bulletin J/M 67–1, dated September 19, 1966 (Government Exhibit G–1), the OEO required that "each Center must develop and enforce those rules that are necessary for its orderly functioning . . . . . Beyond this, Centers have an obligation to create an atmosphere that promotes adherence to acceptable standards of behavior . . . . ." This same bulletin additionally provided that it was the responsibility of the Job Corps Headquarters [OEO] to define general policy regarding discipline, and the responsibility of each Center [FEC] to develop and enforce disciplinary rules. The Bulletin also specified that an on-site isolation facility should be maintained for corpsmen whose behavior constituted a threat to themselves or to any other person or property, and that physical restraint and isolation could be used, but only to the extent necessary to gain control of the corpsman who posed a threat.

Prior to the attack on Gibson there had been numerous incidents of misconduct by enrolled corpsmen, and the OEO had received reports concerning these disciplinary problems. In addition, FEC security personnel had discussed with the OEO on-site representative the need for a secure isolation facility and for deputization of the guards as Deputy U.S. Marshals with arrest authority. (In fact, this was part of an improvement plan (Exhibit P–7) prepared by the FEC staff at Kilmer, but never submitted to OEO for approval.) FEC, however, never requested assistance from OEO in dealing with its discipline problems, and never formally sought permission to build a security facility or to obtain arrest authority for its guards.

---

**5.** The district court found that

42 U.S.C. Sec. 2715 provided that no individual was to be selected as an enrollee unless it was determined that "he is not likely to engage in actions or behavior that would prevent other enrollees from receiving the benefit of the program or be incompatible with the maintenance of sound discipline . . ." Section 2720 provided that "within the Job Corps centers standards of conduct and department shall be provided and stringently enforced."

Finding of Fact No. 2, Dist.Ct.Op. of Mar. 14, 1975, at 8, Appendix at 13a.

**6.** The contract appears in the Record as Plaintiff's Exhibit P–9. The page of the contract (page 9) containing Part XIX is missing from the Exhibit. It is the only page missing from the 57-page contract and schedule. The language of Part XIX quoted in the text is taken verbatim from the Government's Brief at 9–10. No issue has ever been taken with this language by Gibson. We therefore attach no significance to the fact that page 9 is missing from the contract placed into evidence, attributing its absence to an inadvertent error in collation.

## II.

The facts found by the district court which we have summarized in part IB of this opinion, when examined in light of the recent decision in *United States v. Orleans, supra,* lead to the conclusion that the district court erred in imposing liability on the United States for the negligence of FEC, its independent contractor, under both of the district court's theories of vicarious liability.

The plaintiff in *Orleans* brought suit against the Government under the FTCA when he was injured in an automobile accident. The plaintiff alleged that his injury was caused by the negligence of an employee of a community action agency funded under the Economic Opportunity Act of 1964. That agency operated community centers under a contract with OEO. Its employees were not federal employees.[7] The Supreme Court concluded that since OEO did not exercise detailed control over the physical performance of the community agency's tasks, the community agency was an independent contractor, and as such the United States could not be held liable for the negligence of the agency's employees. The Court observed that the FTCA waived sovereign immunity only for the "negligent and wrongful act or omission of any employee of the Government," 28 U.S.C. § 1346(b), and that "employee" included employees of any "federal agency," *id.* § 2671, but that a "federal agency" was defined in § 2671 as *not* including "any contractor with the United States," *id.* The *Orleans* Court then characterized the question as "not whether the community action agency receives federal money and must comply with federal standards and regulations, but *whether its day-to-day operations are supervised by the Federal Government.*" 425 U.S. at 815, 96 S.Ct. at 1976 (emphasis added).

### A. *Respondeat Superior.*

■ Applying the *Orleans* standard to the facts of the case *sub judice* compels us to conclude that the district court erred by its imposition of *respondeat superior* liability upon the United States. While it may be argued that the OEO exercised a greater degree of control over the Job Corps program and the FEC, than it did over community action agencies of the type involved in *Orleans,* nonetheless the district court specifically found that the Government exercised no operational, day-to-day control over Camp Kilmer or FEC's employees.[8]

■ Under *Orleans* the United States may not be held vicariously liable for the negligence of FEC as an independent contractor (28 U.S.C. § 2671), or that of FEC's employees, in failing to supervise or control Jessie. This result is required by the language of the FTCA, as construed in *Orleans.* The fact of broad, supervisory control, or even the potential to exercise detailed control, cannot convert a contractor into an agent, nor can it be the basis for imposing vicarious liability on the United States. *United States v. Orleans.* Thus, the district court erred in concluding that the government could be liable under the doctrine of *respondeat superior* because it "retained

---

7. We recognize that in our case Jessie had been found by the district court to be a federal employee. Finding of Fact No. 41, Dist.Ct.Op. of Mar. 14, 1975, at 13, Appendix at 19a. That difference between this case and *Orleans* is not significant because here Gibson complains of FEC's (and its employees') actions in failing to supervise Jessie properly, rather than the actions of Jessie himself. It is clear that Jessie's actions cannot be imputed to the United States because the FTCA does not apply to any "claim arising out of assault [or] battery . . . ." 28 U.S.C. § 2680(h). *See* note 1 *supra.*

8. Gibson makes the argument that *Orleans* was also based on the fact that the community action agencies involved in that case were "local" in character, and that this case is distinguishable in that the Job Corps program was a national one, and did not have a "local" character. While we agree that the Court in *Orleans* may have been influenced in part by the "local" nature of the community action agency, the key to the Court's holding was clearly the lack of operational control by the Government (despite its close supervision of the community action agency, 425 U.S. at 807, 96 S.Ct. 1971), and accordingly the Court only looked to the community action agency's "local" character for additional support for its conclusion. *See* 425 U.S. at 817–18, 96 S.Ct. 1971.

sufficient control of the manner in which FEC's work was to be performed." (Dist. Ct.Op. of Mar. 14, 1975 at 25, Appendix at 31a). *See also Logue v. United States,* 412 U.S. 521, 93 S.Ct. 2215, 37 L.Ed.2d 121 (1973). Indeed, this court and other courts have consistently held that the United States cannot be vicariously liable for injuries to workmen on Government construction sites, solely because the Government has retained control over the work and safety practices of the independent contractor whose negligence caused the injury. *See Fisher v. United States,* 441 F.2d 1288 (3d Cir. 1971). *Accord, e. g., U. S. v. De-Camp,* 478 F.2d 1188 (9th Cir. 1973); *Gowdy v. U. S.,* 412 F.2d 525 (6th Cir.), *cert. denied,* 396 U.S. 960, 90 S.Ct. 437, 24 L.Ed.2d 425 (1969); *Market Insurance Co. v. U. S.,* 415 F.2d 459 (5th Cir. 1969); *Roberson v. U. S.,* 382 F.2d 714 (9th Cir. 1967); *Lipka v. U. S.,* 369 F.2d 288 (2d Cir. 1966); *Grogan v. U. S.,* 341 F.2d 39 (6th Cir. 1965); *United States v. Page,* 350 F.2d 28 (10th Cir. 1965), *cert. denied,* 382 U.S. 979, 86 S.Ct. 552, 15 L.Ed.2d 470 (1966).

## B. *Inherently Dangerous Activity.*

The district court formulated an alternative theory of liability as follows:

There is another theory of liability, also based on the doctrine of *respondeat superior,* upon which responsibility may vest in the United States for the negligence of FEC. Simply stated, the contractee [the Government] is liable where the work performed is inherently dangerous and the contractor's [FEC's] negligence causes injury within the scope of that danger.

Dist.Ct.Op. of Mar. 14, 1975, at 26, Appendix at 32a.

Although the district court made no express reference to §§ 416 and 427 of the Restatement Second of Torts, it is evident from the New Jersey cases cited by the district court that the court's analysis was predicated on the doctrine which those sections embody.[9] Those sections provide: [10]

§ 416. Work Dangerous in Absence of Special Precautions

One who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a peculiar risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the failure of the contractor to exercise reasonable care to take such precautions, even though the employer has provided for such precautions in the contract or otherwise.

§ 427. Negligence as to Danger Inherent in the Work

One who employs an independent contractor to do work involving a special danger to others which the employer knows or has reason to know to be inherent in or normal to the work, or which he contemplates or has reason to contemplate when making the contract, is subject to liability for physical harm caused to such others by the contractor's failure to take reasonable precautions against such danger.

The "inherently dangerous activity" doctrine of §§ 416 and 427 is an excep-

---

**9.** Section 427 is "closely related to, and to a considerable extent a duplication of, [the rule] stated in § 416." Rest. 2d Torts § 427, comment a.

**10.** Whether the facts of this case present a situation to which § 416 or § 427 may properly be applied is not at all clear. We are not convinced that a Job Corps center "poses a peculiar risk of physical harm" or is inherently dangerous. Nor are we persuaded that an employee of a contractor, injured by the negligence of that contractor, may recover under the doctrine of §§ 416 and 427. It has been argued that the "inherently dangerous activity" doctrine is limited to third parties such as inno-

cent bystanders or adjacent landowners. *See Gibilterra v. Rosemawr Homes,* 19 N.J. 166, 170–71, 115 A.2d 553, 555 (1955); *Wolczak v. National Elec. Products Corp.,* 66 N.J.Super. 64, 75, 168 A.2d 412, 414 (App.Div.1961); *see also Broecker v. Armstrong Cork Co.,* 128 N.J.L. 3, 24 A.2d 194 (E. & A.1942). *But see Rodrigues v. Elizabethtown Gas Co.,* 104 N.J. Super. 436, 444, 250 A.2d 408, 412 (App.Div. 1969) (dictum); *Woolen v. Aerojet General Corp.,* 57 Cal.2d 407, 20 Cal.Rptr. 12, 369 P.2d 708, 711 (1962). Given our disposition of this issue, however, we do not find it necessary to decide these questions.

tion to the general rule that one who employs an independent contractor is not liable for the contractor's negligence. *See* Rest.2d Torts § 409. The doctrine essentially states a theory of vicarious liability, "making the employer liable for the negligence of the independent contractor, irrespective of whether the employer has himself been at fault." Rest.2d Torts, Introductory Note to Topic 2 [which contains §§ 416 and 427], at 394. The liability imposed under §§ 416 and 427 is thus a form of *respondeat superior* [11] liability, imposed upon a contractee as a result of the negligence of its independent contractor. But the FTCA has limited the liability of the Government to the "negligent or wrongful acts" of its employees. In this context, Government employees do not include the employees of independent contractors. 28 U.S.C. §§ 1346(b) and 2671; *United States v. Orleans, supra.* The inquiry then must focus on FEC's status, and, as we have previously pointed out, FEC, which had day-to-day operational control of the Kilmer Center, was perforce an independent contractor. Therefore, under *Orleans,* the Government cannot be held liable for the torts of FEC or its employees. Sections 416 and 427 of the Restatement Second, to the extent they would impose such vicarious liability on the Government, cannot provide the basis for recovery under the FTCA.

▪ Moreover, even if the theory of liability stated in §§ 416 and 427 is construed as a theory of absolute liability of "non-delegable duty" (*see* Rest.2d Torts, Introductory Note to Topic 2, at 394), and not as a theory of vicarious or *respondeat superior*

liability, such absolute liability cannot be the basis for recovery in this case. It is clear that the United States may be held liable only for "negligent or wrongful acts," and may not be held liable on any absolute liability theory. *Laird v. Nelms,* 406 U.S. 797, 92 S.Ct. 1899, 32 L.Ed.2d 499 (1972) (no strict or absolute liability for ultrahazardous activity); *see Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). "Regardless of state law characterization, the Federal Tort Claims Act itself precludes the imposition of liability if there has been no negligence or other form of 'misfeasance or nonfeasance . . . on the part of the Government.'" *Laird v. Nelms, supra,* 406 U.S. at 799, 92 S.Ct. at 1901 (quoting *Dalehite v. United States, supra,* 346 U.S. at 45, 73 S.Ct. 956).

### C. *Direct Negligence of the United States.*

There remains for consideration the question of the direct negligence of the United States. In his opinion, the district court judge, while carefully identifying the two theories of liability discussed above (*see* Parts II(A) and (B) *supra*), also adverted to "a duty [of the United States] to exercise reasonable care to assure the safety of persons coming into contact with its trainees." Dist.Ct.Op. of Mar. 14, 1975, at 27, Appendix at 33a. While this duty to which the district court opinion refers appears to pertain to the district court's analysis of the "inherently dangerous activity" theory of liability, we do not wish to overlook [12] the possibility that the district court was advancing still a third theory on which to predicate the Government's liability.

---

**11.** Indeed, the Introductory Note cited in the text goes on to state that "the liability imposed is closely analogous to that of a master for the negligence of his servant."

**12.** Our difficulty in assessing the direction taken in the district court opinion stems from the district court's language, which speaks to the breach of the government's duty, in failing to provide for adequate safety precautions, as leading to liability in favor of the plaintiff, "regardless of the fact that it delegated certain functions to FEC, an independent contractor." Dist.Ct.Op. of Mar. 14, 1975, at 27, Appendix 33a. However, despite this statement, the district court's conclusion makes no reference to

direct liability, but instead holds that liability is to be found because of *respondeat superior* and the presence of an "inherently dangerous activity" (both of which, as we have pointed out, constitute theories of vicarious liability). If the record does support a theory of liability not addressed by the district court, we may nevertheless affirm. *PAAC v. Rizzo,* 502 F.2d 306 (3d Cir. 1974). In this case, however, as we observe in the text, the record does not provide a basis on which the district court's conclusion can be sustained on this theory, any more than it can be sustained on the two theories of vicarious liability.

Such a theory would be based on a contention that OEO had notice of a dangerous situation, by virtue of the fact that it knew that many enrollees were drug users, had criminal records, or were otherwise potentially violent, and that it had received reports of disciplinary problems at Kilmer. Because OEO had such knowledge, the argument would continue, it had a duty to the plaintiff, and to others foreseeably injured by corpsmen, to take reasonable measures to assure adequate discipline and security. A failure by OEO to provide for adequate security would breach that duty of care, resulting in Government liability. *See McGarry v. United States,* 549 F.2d 587 (9th Cir. 1976), *cert. denied* —— U.S. ——, 98 S.Ct. 398, 54 L.Ed.2d 279 (1977); *Thorne v. United States,* 479 F.2d 804 (9th Cir. 1973). The crux of this argument would necessarily be OEO's supposed failure, in light of the character of enrollees admitted to the program, to construct or require construction of adequate security facilities, or to give FEC's security officers arrest authority by deputizing them as Deputy U. S. Marshals.[13]

■ Assuming without deciding that such a theory of liability is a viable one under the FTCA,[14] and that no discretionary function was implicated,[15] nevertheless

the record in this case will not support a recovery for Gibson. The factual findings of the district court, rather than showing a breach of duty by the Government, demonstrate that OEO had taken reasonable measures to provide for security at the Kilmer Center.

In brief, the district court found that, while the OEO's Project Manager was aware of a proposal that arrest authority be obtained for FEC's security guards,[16] and that a special isolation facility had been suggested, such a plan had never been submitted by FEC to OEO for approval. Finding of Fact Nos. 14 & 15.[17] Moreover, FEC, which had control of the day-to-day operations at the Center (Finding of Fact No. 6), was required to submit a request for the construction of a detention facility or for deputization of its guards if it foresaw the need for these measures. No formal request was ever made by FEC to the Government to provide for either. Finding of Fact No. 16.[18] In addition, although an enrollee could not be discharged from the program without OEO's permission, FEC had the authority to remove physically from the Center any corpsman who caused disciplinary problems.[19] Finding of Fact No. 17. Of added significance is the district court's Finding of Fact No. 18:

> would have averted Jessie's attack on Gibson), FEC clearly believed that obtaining such authority was its responsibility. *See* Exhibit P–3 (a letter from FEC's Center Director to the OEO Project Manager, dated April 19, 1966, describing the Center Director's attempt to get special authority for his security officers from local police); Exhibit P–7 (Kilmer Improvement Plan, dated June 22, 1966, prepared by FEC, proposing that arrest authority for guards and a security facility be obtained).

13. Certainly OEO cannot be held to have been negligent for *selecting and enrolling* drug users, former criminal offenders, and ghetto youths, since those are precisely the people the program was designed to help. *See* 42 U.S.C. § 2715.

14. *See McGarry v. United States, supra; Thorne v. United States, supra.* But see *Fisher v. United States, supra,* and cases cited at p. 1243 of this opinion, *supra.*

15. *See* 28 U.S.C. § 2680(a). It may well be that any decision with respect to the type of security facilities which should be provided at the Job Corps centers is made at a *planning* rather than at an *operational* level. If so, the decision would be pursuant to a discretionary function and excepted from FTCA liability. *See Dalehite v. United States, supra,* 346 U.S. at 42, 73 S.Ct. 956; *Driscoll v. United States,* 525 F.2d 136, 138 (9th Cir. 1975). However, we do not pass upon this question.

16. Moreover, to the extent that the lack of arrest authority was crucial (although it is difficult to ascertain in what way arrest authority

17. All "Findings of Fact" refer to those contained in the Dist.Ct.Op. of Mar. 14, 1975, at 7–13, Appendix at 13a–20a.

18. Also, *see* Testimony of Mr. Thomas, OEO's Project Manager, Tr. V–135.

19. The FEC Center Director also had authority to place enrollees on immediate administrative leave if necessary to safeguard life, property, morale, or safety. Exhibit G–4; Exhibit P–5.

18) On September 19, 1966, O.E.O. in Washington issued Men's Center Bulletin J/M 67–1 (Exhibit G–1). The bulletin delegated to the Center Directors the power to discharge enrollees for disciplinary reasons and required each Job Corps center to provide an on-site facility for the isolation of corpsmen whose conduct constituted a threat to themselves, other persons, or property. The bulletin, however, was never implemented.

*See also* Testimony of Mr. Thomas, OEO's Project Manager, Tr. V–148. That same Bulletin also required that each center provide an "on-site facility for the isolation of those Corpsmen whose behavior constitutes a threat to themselves, any other person, or property," Exhibit G–1, at 8, and authorized the use of "physical restraint or isolation to prevent a Corpsman from injuring himself, another person, or property," *id.; see also* Testimony of Mr. James, security assistant at Kilmer, Tr. I–92.[20] We note as well that OEO's contract with FEC provided that FEC would have the responsibility for taking reasonable precautions to protect the life and health of its personnel (Part XIX of Contract).[21]

From these findings it is clearly evident that the duty to provide adequate security measures devolved not upon the Government, but rather upon FEC. Accordingly, the district court's conclusion that "the Government breached its duty when it failed to provide for adequate safety precautions," Dist.Ct.Op. of Mar. 14, 1975, at 27, Appendix at 33a, finds no support in the record and is inconsistent with the district court's own findings. To the extent, therefore, that the district court opinion may be construed as seeking to premise its holding on a theory of direct governmental negligence, that attempt must fail.

**20.** The Bulletin also specified that, while Job Corps Headquarters had the responsibility for defining general policy regarding discipline, each Center had the responsibility for developing and enforcing disciplinary rules.

**21.** Indeed, FEC had the authority to do all that was needed in this case, *viz,* set aside a room with a strong lock on the door and shatterproof windows. *See* Testimony of Mr. Fogelman, OEO's Contracting Officer, Tr. IV–80.

The record reveals that OEO, in light of the supervisory nature of its responsibilities, properly discharged whatever obligation it had to assure adequate security at Kilmer.[22] In sum, it appears that OEO after formulating its policies, made them known to FEC, informed FEC of its [FEC's] responsibilities, required FEC to take certain basic precautions, and provided FEC with sufficient authorization to do what was necessary in order to perform its functions. Lacking operational control over the activities at Kilmer, the United States cannot be held liable for the lack of proper security facilities at Camp Kilmer.

## III.

## CONCLUSION

Because FEC was an independent contractor for the United States, *United States v. Orleans, supra,* requires that the district court's two theories of vicarious liability be rejected as bases for liability under the FTCA.[23] Moreover, we conclude on the record before us that the OEO staff members, employees of the United States, were not negligent in carrying out any duty to assure adequate security at the Camp Kilmer Job Corps Center. The United States, therefore, may not be held liable under the FTCA for Gibson's injuries, and the district court's judgment against the United States in favor of Gibson must be reversed. Accordingly the district court will be directed to vacate its judgment of June 15, 1976 and to enter a judgment in favor of the United States. As noted earlier (*see* note 3 *supra*) the entry of a judgment in favor of the United States also disposes of Gibson's appeal as to damages at No. 76–2490, and the

**22.** In general, *see* part I (C) of this opinion, *supra* (discussing security at the Kilmer Center).

**23.** *See* p. 1240 of this opinion, *supra,* noting that *Orleans* was not available to the district court at the time its opinion on liability was rendered.

said appeal will be dismissed as moot. Each side is to bear its own costs.

ADAMS, Circuit Judge, concurring in part and dissenting in part.

I concur with Parts A and B of the majority's opinion, which hold that the government is not liable to Ronald Gibson under two different theories of vicarious liability. However, I cannot join Part C of the majority's opinion, where it is concluded, as a matter of law, that there is no evidence in the record of negligence on the part of the government's own employees that would be sufficient to sustain the judgment on behalf of Ronald Gibson. In my view, there is evidence of negligence on the part of the government that does support the judgment of the district court.

### A.

As an aspect of the Economic Opportunity Act of 1964, Congress created the Job Corps to assist disadvantaged, low-income youths by establishing urban and rural centers at which such youths, denominated corpsmen, would participate in vocational programs and other activities. On December 1, 1964, a contract was entered into between the Office of Economic Opportunity (OEO), which administered the Job Corps Program, and the Federal Electric Corporation (FEC). Under the contract, the FEC agreed to operate a residential Job Corps training center at Camp Kilmer, a federal reservation in Edison, New Jersey. Pursuant to the agreement, the day-to-day operations of the Camp Kilmer Center were to be the responsibility of the FEC, although the OEO retained broad supervisory authority over the Center.

As the district court found, numerous incidents of enrollee misconduct and fighting occurred at the Kilmer Center subsequent to its opening. Such misbehavior sometimes involved one hundred or more enrollees. In addition, there were frequent incidents of enrollee intoxication resulting from drugs and alcohol. A number of reports were made to OEO officials regarding the disciplinary problems at the Center. Moreover, OEO authorities were aware that there were enrollees at the Center who had criminal records.

Because of these disciplinary problems, concern was expressed by the guards at the Kilmer Center regarding the lack of a detention facility for unruly corpsmen, and the lack of power to arrest enrollees when circumstances demanded it. There was no such detention facility having special locks or secured rooms at the Center; and the guards were civilians who had no power to arrest anyone. It was thus recommended by the Center to OEO officials that a lock-up be created and that guards be deputized. The request for such changes was never *formally* presented by the FEC to the OEO, but the evidence indicates that the OEO officials were aware of the request.

It was in this setting that the tragic events of November 5, 1966, occurred. On that date plaintiff Ronald Gibson, a group leader at the Center who lived in a dormitory with the corpsmen, heard a violent argument in another section of the dormitory. One of the participants in the argument, Andrew Jessie, was observed to be "belligerent, agressive (sic) and uncontrollable. His eyes were glazed and his speech was incoherent."[1] After separating the adversaries, Gibson returned to his room. About an hour later, there was a further argument involving Jessie. "At this time plaintiff observed that Jessie was talking very loudly and cursing at his antagonist and that his eyes still appeared glazed."[2]

Gibson took Jessie to the duty officer in charge of security, who placed Jessie in a separate dormitory used for unruly corpsmen. This dormitory was physically identical to the others, and "it had no special features or facilities such as bars or special locks appropriate for its function."[3]

---

1. Finding of Fact 24.

2. Finding of Fact 28.

3. Finding of Fact 30.

After approximately another hour had elapsed, Gibson was informed that Jessie had left the dormitory for unruly corpsmen, and had returned to the regular dormitory. Gibson proceeded to the section of the dormitory where Jessie was creating a new disturbance. After trying to calm down Jessie, Gibson went to the latrine section of the dormitory. There Gibson was stabbed in the temple with a screwdriver held by Jessie, and as a result Gibson suffered the serious injury that is the basis of this tort action.

### B.

As the majority properly points out, it is possible to read the district court's opinion as holding that the United States was liable to Gibson on a theory of direct, as distinguished from vicarious, liability. Furthermore, as the majority notes, this Court may affirm the judgment on such a theory even though the district court did not embrace it, so long as there is evidence in the record to support it.[4]

My difference with the majority rests primarily upon our divergent interpretations of the factual record in this case. The evidence, as I view it, does support the theory that the United States itself breached a duty of care to Gibson.[5]

The duty of care as to which the direct negligence of the United States may be found to have occurred requires that the government ". . . exercise reasonable care to see that the contractor takes proper precautions to protect those who might sustain injury from the work." *McGarry v. United States,* 549 F.2d 587, 590 (9th Cir. 1976). *See Thorne v. United States,* 479 F.2d 804 (9th Cir. 1973). That duty arises when the activity engaged in by the contractor over whom the employer has supervisory control is dangerous.[6] The liability arising from the breach of such a duty, as *McGarry* pointed out, is neither strict nor vicarious.

In *McGarry,* the Court held that the Atomic Energy Commission owed a duty of

---

**4.** This Court has written that "(i)t is proper for an appellate court to affirm a *correct* decision of a lower court even when that decision is based on an inappropriate ground." *PAAC v. Rizzo,* 502 F.2d 306, 308 n.1 (3d Cir. 1974) (emphasis in original).

**5.** *United States v. Orleans,* 425 U.S. 807, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976), which the majority relies upon in rejecting the theory of the government's *vicarious liability,* has nothing to do with the theory of the government's *direct negligence* in this case.

**6.** Restatement, Second, Torts § 414 provides that:

One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

Comment (a) pertaining to that section stresses that one who retains "supervisory control" over the activities of the contractor may be liable under the section "unless he exercises his supervisory control with reasonable care so as to prevent the work which he has ordered to be done from causing injury to others." Comment (b) underscores the point that liability may arise when the work engaged in by the contractor is "unreasonably dangerous" to others.

New Jersey courts have adopted § 414 of the Restatement. *See, e.g., Bergquist v. Penterman,* 46 N.J.Super. 74, 134 A.2d 20, 26, certification denied, 25 N.J. 55, 134 A.2d 832 (1957). *Cf. Marion v. Public Service Elec. & Gas Co.,* 72 N.J.Super. 146, 178 A.2d 57, 62 (1962).

It might be argued that, in this case, the extent of the OEO's control over the operations at Camp Kilmer was insufficient to bring into play § 414 of the Restatement. However, Comment (c) of § 414 makes clear that day-to-day operational control by the party sought to be charged is not required. It provides that there must be more than "a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations." Nevertheless, the requisite supervisory control "does not mean that the contractor is controlled as to his methods of work, or as to operative detail." In this case, there are findings that the OEO was responsible for approving the extension of physical security at the Center, and that the OEO maintained a permanent representative at the Center to report to Washington, D.C. Thus, although the "operative detail" of the Center's activities was not determined by the OEO, the OEO retained a broad supervisory and operational authority for activities carried on at the Center.

care to the employees of an independent contractor—hired to manage, operate and maintain the Nevada Test Site—in order to make sure that the employer was taking proper precautions regarding the hazards of work near a power line at the site. The *McGarry* Court stressed that its holding did not require that the AEC place an on-site inspector in the vicinity of all work on the power line in question. Rather, it wrote:

> If, here, the AEC had made regular examinations to ascertain the practices being followed by REECO (the contractor), and was reasonably satisfied from its examinations that appropriate guidelines were being followed, this might well have been found by the trier of fact to suffice. No such examination was conducted here and the district court found that *the AEC had failed to exercise reasonable or any care to see that proper safety precautions were taken by REECO* with reference to work performed in the neighborhood of the power line.[7] (emphasis added)

Liability of the government for a breach of the duty of care articulated in *McGarry* is not foreclosed by a claim of sovereign immunity. For the Federal Torts Claims Act (FTCA) waives sovereign immunity for the "negligent and wrongful act or omission of any employee of the Government," 28 U.S.C. § 1346(b). Thus, the critical question here is whether there is evidence regarding a breach by Government employees of the relevant duty of care.

An analysis of this issue must rest, of course, primarily on the findings of the district court. The district court found that the OEO's project manager for the Job Corps, based in Washington, D.C., was responsible for approving numerous aspects of the Center's operations, including the extension of physical security at Camp Kilmer.[8] OEO was also found to have maintained a permanent "on site" representative at the Center to report to Washington, each week, all problems such as those relating to security.[9]

Moreover, the district court ascertained that incidents of enrollee misconduct were "routinely" reported to the federal officials responsible for the Job Corps program.[10] It further found that the selection of enrollees was solely the responsibility of the OEO, and that sometime after July of 1965, an apprehension was expressed to the OEO that the Center was getting "too large a proportion of enrollees who were disciplinary problems."[11]

Prior to November 5, 1966, when the assault on Ronald Gibson occurred, the trial court noted that there had been many incidents of misbehavior by corpsmen, "including fights sometimes involving 100 or more enrollees, and intoxication due to alcohol and drugs."[12] Security personnel had conveyed their concern over the possibility of a riot at the Center. In addition, prior to November of 1966, OEO officials received "frequent reports of disciplinary problems at Camp Kilmer," and at least one OEO official "was aware that a narcotics addiction problem existed at the Center."[13]

The district court made a number of findings regarding the lack of a detention facility at the Center for unruly corpsmen. It found that a document containing proposals that a special detention center be created for emergencies, and that some form of arrest authority by the Center's security guards be provided, was prepared by the Kilmer Center staff prior to November of

---

7. 549 F.2d at 590–591. Although *McGarry* noted that the district court had found that the AEC did "nothing" to determine whether the contractor was fulfilling its contractual obligations to provide safely for the employees, 549 F.2d at 590–591, its holding did not turn on this fact. There is no indication in *McGarry* that for the government to be liable for direct negligence, it is necessary to show that nothing at all has been done by the government regarding the risk in question.

8. *See* Finding of Fact 7.

9. *See* Finding of Fact 11.

10. Finding of Fact 5.

11. Finding of Fact 10.

12. Finding of Fact 12.

13. Finding of Fact 13.

1966, and that, even though it was never officially submitted to the OEO project manager for the Job Corps, the project manager was aware of the plan.[14] Also, the court noted that on numerous occasions the security assistant at the Center "had discussions with OEO's on site representative about the need for a detention facility and for the deputization of security guards."[15] As the district court determined, the Center's security personnel were "civilian employees of FEC who were not empowered to make arrests, or to carry weapons."[16] Nevertheless, the OEO never required the FEC to construct such a facility or to seek arrest authority for its guards.[17]

These findings, taken together, support the propositions that (1) the OEO had notice of a dangerous situation at the Center, (2) the OEO had notice of concern on the part of the Center staff regarding the lack of a secure detention facility and of a form of arrest power on the part of the guards, (3) the OEO had notice of a plan for such changes, and (4) the OEO did not take any steps to see that these deficiencies were corrected so as to provide protection of the FEC employees, including Ronald Gibson. On these facts, it is reasonable to conclude that employees of the government breached a duty to take reasonable measures to guarantee that adequate security was maintained at the Center, and that one of the Center's employees was injured as a consequence of a foreseeable risk stemming from such a breach.

Yet, the majority rejects the theory of the government's negligence substantially on the ground that a *formal* plan for the construction of a detention facility and for the deputization of the Center's guards was never submitted by the FEC to the OEO.[18] This position would appear to overlook the fact that the project manager of the Job Corps was found by the district court to have been aware of the existence of a plan formulated by the Center staff that proposed these changes. To take a trial court verdict from a plaintiff critically and tragically injured on the basis of a lack of a formal request by the FEC to the OEO for increased security at the Center would seem to ignore the basic duty of the government at issue in this case, and also, as a practical matter, to put an undue emphasis on the form of the notice received by the OEO regarding the need for such precautions.[19]

Moreover, the proposition, cited by the majority, that the contract between the FEC and the OEO provided that the FEC would have the responsibility to take precautions to protect its personnel[20] is not dispositive of this case. Unless the majority is suggesting that the government can contract out of its duty of care to the employees of its contractors in circumstances such as those here—a doubtful result for which no authority is supplied—then I see no sense in which the terms of the contract may be viewed as central to this tort action. What *is* crucial here, in my view, is the evidence bearing upon the duty of the government to take reasonable precautions to assure the safety of employees like Gibson, and the breach of that duty.

In addition, the fact that the district court found that, in September of 1966, the OEO issued a bulletin requiring all Job Corps centers in the country to "provide an on-site facility for the isolation of corpsmen whose conduct constituted a threat to themselves, other persons, or property"[21] —which, says the majority, assumes "added significance" in this case—is not at all dispositive. First, the bulletin was evidently a

14. *See* Finding of Fact 14.

15. Finding of Fact 15.

16. Finding of Fact 9.

17. Finding of Fact 16.

18. *See* p. 1245.

19. This is not to suggest that the FEC did not have a duty to take safety precautions. However, the point stressed by the majority that the FEC had a duty does not mean that government employees did not also have a duty of care in the circumstances of this case.

20. *See* p. 1246.

21. *See* Finding of Fact 18.

general one addressed to all Job Corps centers, and was not in response to the particular problems associated with the Kilmer Center. Moreover, requiring that there be an "isolation" facility for unruly corpsmen is not the same as requiring the construction of a *detention* facility that would function as a lock-up in which to restrain violent enrollees. Indeed, Gibson's assailant, Jessie, was himself placed in an isolation facility, a dormitory room separate from the living and working quarters of the Center, after Gibson removed him from his own dormitory. However, because the isolation facility was not secure, and thus did not detain him, Jessie soon returned to his own dormitory. Thus, even with an isolation facility at the Center, the injury that is the subject of this action was not averted.

### C.

Given that the facts support the conclusion that a duty to provide adequate security measures, which devolved upon the government, was breached in this case, it is necessary to consider whether the duty in question entails a "discretionary function." 28 U.S.C. § 2680(a) provides that the FTCA does not permit a claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." As the court in *Driscoll v. United States,* 525 F.2d 136, 138 (9th Cir. 1975) wrote, ". . . the discretionary function exception is limited to decisions made at the *planning* rather than the *operational* level." (emphasis in original)

The argument that the provision of a secure detention facility and of arrest power for the guards at the Center was a discretionary function rests on the premise that the OEO delegated the complete operational control of such matters to the FEC,

and retained only a broad planning authority with respect to safety aspects at the Center. Yet, the findings by the trial court do not support such a proposition.

As the district court found, the OEO maintained close supervision over the Center, having an on-site representative there who was responsible for reporting weekly to officials in Washington, D.C., about matters such as security. Moreover, "(n)umerous aspects of the Center's operation, including the extention of physical security, were subject to . . . approval" of the OEO project manager in Washington, D.C.[22] The fact that the OEO had to approve security measures implemented by the Center clearly does not establish that all operational questions were delegated to the Center. Indeed, the requirement of OEO approval of security measures supports the view that the government was involved at more than a broad planning level in overseeing the safety of conditions at the Center.

As in *McGarry, supra,* the government here "chose to retain some responsibility over matters of employee safety."[23] In light of the facts of this case, it would be reasonable to conclude that the fulfillment of those responsibilities was an "operational function." A holding that the government is liable for negligence is thus not barred by the "discretionary function" exception of the FTCA.

### D.

On the basis of the findings of fact by the trial court, which have not been attacked as clearly erroneous, I would hold that the conclusion that there has been a breach of the duty of care owed by the government's employees is not an unreasonable one. Consequently, I would affirm the judgment of the district court regarding the liability of the government.[24]

**22.** Finding of Fact 7.

**23.** 549 F.2d at 591.

**24.** Since the majority's disposition of the question of liability in this case renders it unnecessary to discuss Gibson's cross appeal on the issue of damages, I decline to do so, except to say that I would remand that portion of the case dealing with damages to take into account any injuries resulting from Gibson's alleged inability to attain a doctoral degree after the attack in question.